IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

ORIGINAL

DeARCY HALL, J.

BLOOM, M.J.

_Refki Kastrati_

_(Write the full name of each plaintiff who is filing
this complaint. If the names of all the plaintiffs
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)_

-against-

Progress of Peoples Menagement Corp
Gloria Mitchel; Jeanmarie;
Tim Hurley; HR Department

_(Write the full name of each defendant who is
being sued. If the names of all the defendants
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)_

Complaint for Employment
Discrimination

Case No. **CV 18 - 6731**
_(to be filled in by the Clerk's Office)_

Jury Trial: ☑ Yes ☐ No
_(check one)_



RECEIVED
NOV 20 2018
PRO SE OFFICE

## I. The Parties to This Complaint

### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Refki Kastrati |
| Street Address | 297 Clinton Street, & 1st Floor |
| City and County | New Britain, |
| State and Zip Code | CT 06053 |
| Telephone Number | 646-244-4719 |
| E-mail Address | mamuqe@hotmail.com |

### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known). Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Progress of Peopless Menagement Corp. |
| Job or Title (if known) | |
| Street Address | 191 Joralemon Street |
| City and County | Brooklyn, KINGS |
| State and Zip Code | New York 11201 |
| Telephone Number | |
| E-mail Address (if known) | |

Defendant No. 2

| | |
|---|---|
| Name | Gloria Mitchel |
| Job or Title (if known) | Regional Property Manager |
| Street Address | 191 Joralemon Street |
| City and County | Brooklyn, KINGS |

2

Defendant No. 3

Name · Jeanmarie
Job or Title · a social worker at Mary Star of the Sea
(if known)
Street Address · 191 Joralemon Street
City and Count · Brooklyn, KINGS
State and Zip Code · New York 11201
Telefon Number
E-mail Address
(if known)

Defendant No. 4

Name · Team Hurley
Job or Title
(if known)
Street Address · 191 Joralemon Street
City and Count · Brooklyn, KINGS
State and Zip Code · New York 11201
Telefon Number
E-mail Address
(if known)

Defendant No. 5
Name · HR Department John/Jane Done
Job or Title · HR
(if known)
Street Address · 191 Joralemon Street
City and Count · Brooklyn, KINGS
State and Zip Code · New York 11201
Telefon Number
E-mail Address
(if known)

| | |
|---|---|
| State and Zip Code | New York 11201 |
| Telephone Number | |
| E-mail Address (if known) | |

## C.    Place of Employment

The address at which I sought employment or was employed by the defendant(s) is:

| | |
|---|---|
| Name | Progress of Peoples Mengagement Corp |
| Street Address | 191 Joralemon Street |
| City and County | Brooklyn, KINGS |
| State and Zip Code | New York 11201 |
| Telephone Number | |

## II.    Basis for Jurisdiction

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

√    Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note: In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note: In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

√    Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

3

☐ Other federal law *(specify the federal law):*

_____

☐ Relevant state law *(specify, if known):*

_____

☐ Relevant city or county law *(specify, if known):*

_____

## III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A. The discriminatory conduct of which I complain in this action includes *(check all that apply):*

☐ Failure to hire me.

☑ Termination of my employment.

☐ Failure to promote me.

☑ Failure to accommodate my disability.

☑ Unequal terms and conditions of my employment.

☐ Retaliation.

☐ Other acts *(specify):* _____

*(Note: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B. It is my best recollection that the alleged discriminatory acts occurred on date(s)

_____

4

C.  I believe that defendant(s) *(check one)*:

        ☐ is/are still committing these acts against me.

        ☐ is/are not still committing these acts against me.

D.  Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

        ☐ race _____

        ☐ color _____

        ☐ gender/sex _____

        ☐ religion _____

        ☐ national origin _____

        ☐ age.  My year of birth is _____.  *(Give your year of birth only if you are asserting a claim of age discrimination.)*

        ☑ disability or perceived disability *(specify disability)*

        Kidney Disability /dialyses treatment

E.  The facts of my case are as follows.  Attach additional pages if needed.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

*(Note:  As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

**Refki Kastrati**
**297 Clinton Street, #1st Floor**
**New Britain, CT 06053**
**Ph#646-244-4719**
**e-mail: mamuqe@hotmail.com**

**EEOC Charge# 520-2018-01829**

Dear Sir/Madam

My name is Refki Kastrati, born 09/22/1967, I have worked as Superintend II with Progress of People Management Corp., for a duration of five years. Because of dialyses treatment, my work hours were 7:AM to 3:00PM on Monday, Tuesday, Wednesday, Saturday, and Sunday. I was been diagnosed with kidney malfunction in 2001, which I resolved by submitting to a successful kidney transplant operation in 2004. The transplant kidney was successful until about 2011 when the function of it too began to fail in its performance I required kidney dialysis treatment. However, with appropriate medical treatment that I did receive, kidney Disability did not in any way weaken my ability or capacity to seek and remain gainfully employed, in performing the role and duties of my job. From December 2008 I used to work as a Maintenance Worker at United Cerebral Palsy of New York City. On September 2012, for a better opportunity, I left United Cerebral Palsy of New York City and start a new job with Progress of People Management Corp. at Mary Star of the Sea, 41 1st Street, Brooklyn, NY 11231 as Superintend II until December 11, 2017. There were coming and going different Regional Property Managers'. There was never an issue because of my absence during my dialyses treatment which were/are from 4:00PM to 8:15-8:30PM Monday, Wednesday, and Fridays'. I was happily preforming all my work duties until Ms. Gloria Mitchel took position as Regional Property Manager. Entire accusation that were made against about my poor work performance, false accusation, and flipping my words are/were just to terminate me from position which I held it, and only because I cannot be around work site 24/7; because I require my dialyses treatment. The Progress of People Management Corp., Gloria Mitchel, Jeanmarie (a social worker at Mary Star of the Sea, I don't know her last name), Tim Hurley, and HR Department, John/Jane Done. The above-mentioned conduct by respondents violate provisions of Disability Federal, State, and NYC Law.

First few months were OK, around August 2017 Ms. Mitchel start making complaints out of nowhere. From a nice person to totally different one; her attitude changed dramatically toward me when she learned that I am dialyses. On my way to the lobby to check for my work orders,

1

she called me to the office. She asked me: "Why didn't you open door for tenant, instead, you send your son to open the door?". It was after work hours, while I was at dialyses treatment. I told Ms. Mitchel that: I don't know if you heard, but I have to go for dialyses treatment three times a week. She didn't accommodate me, instead, yelled at me by saying: "I heard that, and why did you accepted the position if you are sick, you need to be at a work site 24/7!!!". I told her that "I need to survive, that's why.". I was afraid that she will fire me. I went at my apartment, I was trembling. My wife and my younger son were there. I told them that Gloria will fire me. My wife asked me: Why? I told to my wife that she told me "why you accepted job if you are sick, you need to be at work site 24/7". My wife asked me three times. The third time I told the same without knowing the consequences of it. My wife graduated from John Jay College of Criminal Justice with BA in Law and Society, Associate in Criminal Justice, and History Minor. She knows rules and regulations better than me. She explained to me that they cannot fire you because of your Disability. Disabled People are Protected by the Law. Without my knowledge, (my wife is known to everyone as Jenny) went to speak with Ms. Mitchel. She went few times, Ms. Mitchel wasn't in the building. So, she spoke with Jeanmarie, a social worker. She told Jeanmarie: "for five years we always open door for tenants while Refki is in his treatment. What has changed now?" Jeanmarie talked to my wife the same words which Ms. Mitchel told me, "why he accepted the position if he is sick, he supposed to be in building 24/7. When my wife told her that "you cannot say something like that to disabled people. Disabled people are protected by Law". Jeanmarie told to my wife:" I hope you're not going to sue". My wife, Xhevahir/Jenny told her: "No, I don't want to do that, but if Ms. Mitchel continues harassing my husband, I will". Jeanmarie know that I am in dialyses since I started working there. They know that every Monday, Wednesday, and Fridays from 4:00PM to 8:15-8:30PM I am at my treatment; that's why only my work schedule was from 7:00AM to 3:00PM.

When I interviewed for Superintended II with Progress of People Management Corp. position Tom and Craig, I don't remember their last names, I told them that: "I cannot be at the work site 24/7. I have doctor's appointment and I need to go for my treatment; that's why then I requested my work hours to be from 7:00AM to 3:00PM". They told me: "it is good to be around, but you don't have to be. That's why superintend should have a family. No one cannot be at work site 24/7". Therefore, because of my work experience, I was offered more pay than previous superintendents.

The first written accusation made by Ms. Mitchell which is entire false accusation was on July 18, 2017, as Verbal Warning which is attached as **Exhibit A**. In the verbal warning she accused me for not clocking in and out on May 30, 2017, Memorial Day; July 3rd and 4th, 2017. I told her that I tried out to clock in, but it didn't work, and one of the holidays I forget to clock in. Usually, for holidays, 90% of times I couldn't clock in or out. She wrote that I told her: "…that I worked those days but did not-clock in or clock-out as required", which I never said that to her. Ms. Mitchel flipped my words, she wrote however she wanted. And these are false accusation made by Ms. Mitchel. She also reminded me of required services at sides that operate 24 hours again.

The second written accusation made by Ms. Mitchel was on September 12, 2017 a Final Written & Probation in Lieu of Termination, for: "(1) failing to complete repairs on 2 apartment on August 27th,( 2) not working normal schedule on September 4th, clocking in and out for 4 hours, and (3) failing to be on-side on September 2nd to assist a tenant's aide stuck in an elevator, and sending his wife and son to help the aide". A copy of a Final Written & Probation in Lieu of Termination is attached as **Exhibit B**.

The first accusation is false; I went at apartment, knock at door, no one opened door. In the second apartment, I and John, a coworker, knocked at the door, and no one was there to open door (I don't remember which floor or apartment was). I told her that, she simple didn't want to hear me, she did whatever she wanted because she has a power over me. Ms. Mitchel falsely accusing me for not completing my work order. My work orders never were staying more than a day or two day; I finished as soon as possible.

The second complain about clocking in and out for 4 hours. When we had a superintendent meeting with CCBQ staff, they told as about the holidays to clock in and out only for four hours, and we can take day off any other day. I told that to Ms. Mitchel, and she told me: "if you clock in and out only for four hours, you will be getting payed only for hours that you worked, and you will not be going to get a day off". I told her doesn't matter to me, and why she is making as a big deal. I asked her what I should do for next time, how you want me to clock in and out for other holidays. She yelled and told me: "get out of my office".

The third accusation, I was on my vacation. I send my son to see if he can help the tenant aide stuck at elevator. My wife went with our son to. While on the vacation, far away from the work

side, I instructed my son and wife how to open the elevator door. They both successfully open the elevator door before FDNY arrived. I trained my son how to open elevator doors, paint, clogs sings, etc., when I retired to take my position, or help elsewhere. It is good to know everything. I always told/teach my children to help others, that how I was educated, and how I am educating my children to always help others in need. The copy of Bay Ridge Security Services Inc., Incident Report of September 2, 2017 is attached as **Exhibit C**. In the Exhibit B she also mentions "Respond to 24-hour facility…Ability to work a flexible schedule providing evening, weekend, and holiday…" again. She asked me "why I didn't report the incident", I told her that I am on my vacation. I wasn't around the building. Simple, she wrote whatever she wanted, again. Finding more complaints against me, even if they are false accusations, simple, because I am not able 24/7, simple because I am not around work site during my treatment, even my vacation days. She treated me as a **SLAVE**. I asked John, a coworker, about Ms. Mitchel attitude toward him. John told me: "no, she never bothers me".

She also made complain for September 6, 2017 which it was Wednesday for not being on the work site. She knows already that on Monday, Wednesday, and Fridays from 4:00PM to 8:15-30PM I am in dialyses treatment. I told that since August, she didn't want to stop. Ms. Mitchel goal was to terminate me only because I am not able to be to be at work site 24/7; only because I need dialyses treatment. All the complaining's made by Gloria were while I was on dialyses treatment, or on my vacation days. On September 13, 2017, a day after Final Written Warning I went to Human Resources and let them know about Ms. Mitchel has treated me, and I requested Family and Medical Leave Act (FMLA) and what papers I need to send it. The HR told me to bring a proof of dialyses treatment and if I am able to work from the place where you receive treatment. When I interviewed for Superintended II with HR of Progress of People Management Corp. position Tom and Craig, as I mention before, I do not remember their last names, I told them that I cannot be 24/7 at work site. I have doctor's appointment and I need to go for my treatment; that's when I requested my work hours to be from 7:00AM to 3:00PM. They never asked me what kind of treatment is, or to send a doctor prove.

After I spoke with HR, I wished I newer was born what Gloria did to me. I was afraid to go upstairs when Ms. Mitchel was there. She always finds something to say. Why the gas meter room door is open? Why the back door is open? She even told me: "why you simple don't quit", I told her that you can fire me, but I will never quit, I love my job. During my work hours, some

4

of the time the gas meter room is open because all working tools are there. I found them when I start working. And there is no elsewhere to store them. She saw that one part of gas meter room is used for storage for the first day when she started working with CCBQ. Therefore, from the main office I was getting visits/control much more than usually after I told about Gloria's attitude toward me.

On October 11, 2017, I got a call from Gloria to go se her at office. I was on my way to clock out, and I wanted to request my last vacation days. Instead she was accusing me for not being on work side during my work schedule. Because my car wasn't there, and the gate was open. I told her that my son went to buy cigarettes, and I don't know who left the gate open, maybe my son or bus drivers. Simple I dint see who left it open. She also asked me where I was during that morning. I told her that first I was in the basement after I went on the roof and staircase inspecting lights. Attached copy which it was send to HR and given to Ms. Mitchel on October 10, 2017 including my proof of dialyses treatment as **Exhibit D** and doctors note for FMLA, as **Exhibit E**. She asked me to write a paper what I was doing that day, I told her that I don't write English good, I need to wait until my son is back from school, which is attached as **Exhibit F**. I told Ms. Mitchel that really, I don't know what I was doing wrong, she told me: "leave my office". It wasn't clear to me, so I went back, and I asked if I was fired. She just told me don't threaten me. I didn't know what to do I just left. The accusation made by Gloria on October 8, 2017 is attached as **Exhibit G** which it was e-mailed by Gloria to HR. At the Exhibit G, again Ms. Mitchel give a false statement by flipping my words to: "...I gave 3 different stories of location at the time...". As I mention above, I told her, first I was in the basement after I went on the roof and staircase inspecting lights. She sends to HR letter by flipping my words to her own words, which her goal was simple to terminate because of my condition, because I am not able to be 24/7 on work site. HR believed her side of the story (Exhibit D). She also asked John if he seen who left the gate open. At John statement on November 9, 2017, which is attached as **Exhibit H**, he never mentions by seeing me taking a car or living back door open or/and gate door open. On November 14, 2017, I got FMLA from HR, a copy is attached as **Exhibit I**. In one part says that "Your FMLA leave request is approved...", but at the last page of FMLA says: "Intermittently". I will not comment more because I am not sure what they mean with it.

As I mention above, on September 13, 2017, a day after Final Written Warning I went to Human Resources and let them know about Ms. Mitchel have had treated me, and to see what documents

I need for FMLA. From then on, from the main office, I was getting visits/control much more than usually, almost every day. On November 29, 2017, Tim Hurley gives a visit to Mary Star of the Sea, 41 1st Street, Brooklyn, NY 11231, and saw an electrical scooter charging in a gas meter room. He took a picture of it, which is attached as **Exhibit J**. As it seen at a picture, it was electric charging scooter at beginning of gas meter room. Do not block the Exit access, most of the scooter was in the front of gas meter room door. There it wasn't any other place to charge scooter. I was charging my working tools for five years in the same place. And it wasn't stored as they mention, it was just charging for 1-2 hours. Ms. Mitchel was accusing me saying: "that is gas powered scooter"; I told many times that is not gas-powered scooter, she didn't even want to listen what I was saying. I told Ms. Mitchel again and again that is not gasoline powered scooter, it is electric powered scooter that's why I put to charge. If it is gasoline scooter you don't have to charge with electric. According to Meters and Gas Service Piping, the scooter didn't violate NYC Building Code; it was much further than it is allowed. I bought electric scooter because of Gloria's complain being in the work site 24/7. Because, with a scooter I will get faster at work side which she requested by saying, and in writing many times not being at work site 24/7. When Mr. Hurley took a picture of my electric scooter, why he didn't take a picture of many other rubbishes, office supplies stored for many-many years before I started working there. Of course, because they don't belong to me, because I was targeted to be terminated no one else.

One day while I was on dialyses treatment, I got a call from security that a tenant was lock-out. Because no one was allowed to open the door or give any other help to tenants, after two hours of treatment which usually I get four hours treatment, I told the nurse to stop my treatment because a tenant was locked out, and if I don't go Ms. Mitchel will yell at me, she will make a complain. And, I don't want to lose my job. The nurse stopped my required four-hour treatment and I went to the building to open the door for the tenant. Also, because I was getting to much pressure from Gloria, I was losing a lot weight. One of the nurses told me that you lost more 10 kilos within a few months, that is not healthy. I told them everything about what is going on at my job, all the stress that I was getting from CCBQ.

Complaints after complaints, false accusation after false accusations, flipping my words, and on December 11, 2017 I got a phone call from Ms. Mitchel to meet at the lobby conference room. She was companied by two people, I didn't know who they were. Gloria told me: "from now, December 11, 2017, you are terminated from the position as Superintended II with Catholic

Charities Brooklyn & Queens Progress of the People Management, and you have five days to vacate the apartment". Attached as **Exhibit K** is a copy of termination given to me by Gloria Mitchel.

In the termination letter, there were complaints about seen the back door and parking gate open. And, because my car wasn't in parking lot (more information was given above), because of a "gasoline powered scooter (which it wasn't gasoline powered, it was an electric scooter) was in the gas meter room (more information was given above), and because my work performance did not improve". When we have had building inspection, the Director of Progress of Peoples Management Corp., Tom (I do not remember his last name) told me that we never got a higher grade than ever before; we got 97% out of 100%. Same higher grades I got for every building inspection located at 41 1st Street, Brooklyn, NY 11231. I requested the building inspection grades copies from attorneys Jackson Lewis P. C. for Progress of Peoples Management Corp., Ravindra Shaw by sending an E-mail. Therefore, Mr. Shaw's excuse was: "because I used my wife's e-mail, he doesn't want to send it". I will request in writing on further notice, a copy of Mr. Shaw is attached as **Exhibit L.** He uses my wife's e-mail to send a notice also; after couple days, I got a hard copy by mail, the same letter which he used to send it by using my wife e-mail.

The same day when I was terminated, I took a video with my cellphone to show how far was a scooter charging. Pictures which were cut from the video is attached as **Exhibit M.** As you see at the picture/video, the building is also in violations of NYC Building Code which states "Gas Meter rooms shall always be kept clear of all rubbish; and shall not be used for storage purposes". However, there is several storage items including couches which purpose is furniture for the first floor, which were removed and placed in the same room "Gas Meter room". There are also file cabinets, documents, which they were stored for who knows how many years, building equipment such as refrigerators which purpose are for tenant's household. According to their accusation, they violate NYC Building Code also which is attached as **Exhibit N.** They know that they violate themselves NYC Building Code in many ways to, therefore, they just wanted to find reasons about me, they just wanted to terminate me and only because I couldn't be in an on-site work 24/7.

When I started working with CCBQ at 41 1st Street, Brooklyn, NY 11231, they were storing in the Gas Meter room a gasoline powered snow-blower and lawnmower, many office supplies, and different rubbish. John told me: "we store in here because there is no other place to store them".

Because of no other place to store them, John and I always remove all gasoline from snow-blower and lawnmower before we stored in a gas meter room, further than is required by NYC Building Code. But, anyway, no one wanted to listen to me, simple because I was targeted by Progress of People Management Corp., Gloria Mitchel, Tim Hurley, and HR Department to be terminated, simple only because I am sick, and I couldn't be around work site 24/7.

On December 14, 2017 I sent a letter requesting more time to move from apartment because of the Holiday season, and because of my treatment. I requested three months or until I find another place to place my family. In five days, there it was impossible finding a new place, a copy of it is attached as **Exhibit O**. Two people came from main office and told us that "we can stay until January 20, 2018". My wife and I looked for a new place all over New York; some apartments, we couldn't afford, some apartments didn't allowed dogs or only 25 pounds big and if I told them that the dog is emotional supporting one. We have an emotional supporting dog for our son. When a group of people attacked and robbed my son, Bledi Kastrati, had a brain injury, he was afraid to go outside alone for many years. I would not give more info about my son because of the confidentiality. We tried many things to help him, so we decided to get a dog for him (which was/is around 57 pounds). Because, the dog needs to be walked, he starts going outside with a dog, he felt safe without me or my wife accompanied him. We couldn't let his dog, Angel behind (we named a dog Angel because of my son situation); rather we will stay in the streets. Time was ticking out, and we still couldn't find a new place. The winter of 2017-2018 was really one of the coldest winters in New York. Finally, my sister, Sadie, found a place in New Britain, Connecticut. Because, of the cold/frizzing winter and in advance need to finding a dialyses facility near where I will live, we didn't have any other choice, only to move far away from New York to move at New Britain, Connecticut.

While still at Mary Star of the Sea, 41 1st street, #Supt., Brooklyn, NY 11231, my wife took several videos for letting the gas meter room door open, storing a snow-blower and lawn mower at gas meter room, and letting the back door open, which all of these led to my termination. A picture cut from the videos is attached as **Exhibit P**, also, please watch the videos for more details. The videos were taken from December 11, 2017, thru January 20, 2018.

While still at Mary Star of the Sea, 41 1st Street, Brooklyn, NY, I applied for unamployment which I was granted with it, the CCBQ/Progress of People Management Corp., put stop at my unamployment benefits. I requested a hearing. Before a hearing, from the Labor Department I

got a call about the reason of my termination back and forth. Because, I couldn't afford to pay my phone; the last conversation with the NY Labor Department was they will call me back for more information. The first decision was made without me finishing a further conversation, a copy of the decision is attached as **Exhibit Q**. I requested a hearing for the second time on February 25, 2018. The hearing was held on March 2018. Judge Diane Dubiac overruled the previous decision and unamployment wages were paid to me. The copy of hearing is attached as **Exhibit R**.

Before my unamployment hearing, I got a stack of documents from the Labor Department. A letter sent to Labor Department, NY, Ms. Mitchel states: "He was advised on many occasions to clean OUTSIDE-ROOM" and not gas meter room. The copy of Ms. Mitchel's written words sent at the Labor Department is attached as **Exhibit S**. She also mentions: "…between 1/8 & 1/19 as there was a prediction of snow in the forecast around that time. The snow blower was returned to the correct closed…". First, if you watch the last video which it was taken on January 20, 2018, the day when we moved, the snow-blower and lawnmower were covered, and they weren't only for a few days, they were stored in the "gas meter room". As I mention before, there is no other place to store them. Yes, it was a common practice of me and John, and the previous superintendent. We move the snow-blower and lawn mower when we have had inspections, all of CCBQ know about it. But, of course, then it wasn't me, it was John. Do not take it wrong, I don't have any complaints about John, he is a good worker and a good friend. It is because when I did something, it was a huge problem. And, the only thing was: BECAUSE I WAS TARGETED TO GET TERMINATED FROM A JOB, ONLY BECAUSE I AM UNABLE TO BE AT WORK SITE 24/7 BECAUSE OF MY DIALYSES TREATMENT.

The copy of Mary Whelan's work order which was sent to Gloria is attached as **Exhibit T**. The first time I seen a copy of the work order was when I got a package from the Labor Department, which was included with other documents. Ms. Whelan spoke to my wife about where to leave the flowers during the winter time. My wife told Ms. Whelan: "before I left them there for winter time, I asked Felita, where she can leave the flowers for the winter time. Felita, Supervisor at Mary Star of Sea at 41 1st Street, Brooklyn, NY 11231, told me to leave it at that spot". Anyway, after I was terminated two people from the main office came, they told my wife that she cannot leave the flowers anywhere in the basement. You can: "put flowers at your apartment because of the fire hazard". They weren't even close to the gas meter room. The two people from the main

office both didn't see a snow-blower, lawnmower which are gasoline powered, and all the rubbish at the Gas Meter room. Of course, because no one else is targeted anymore to get terminated from they're jobs. Because we must move, and at our apartment wasn't big enough to store all the flowers, she placed all the flowers in the street for someone else to take. She kept only five of them. At the end of the day, all flowers were taken by someone else.

At Exhibit S, Ms. Mitchel also accused me for having/keeping an additional set of keys that unlocks the gas meter, boiler, and several other rooms in the basement. First, the gas meter room key was only one key; before Gloria took the position as supervisor, the previous supervisor Michelle told me to make a copy of it. I sent the key to make a copy, many places that I went, they couldn't make a copy. When we start moving, my wife found some keys behind cabinets when I used to keep the keys. She put them where Ms. Mitchel told me to leave the rest of the keys after I move.

Because we have had to move far away from New York, my wife must quit all three job's. She (my wife) used to work at Law Office of Marina Trubitsky (full time), The Winter Reporting (part time), and at Caputo Bakery (Saturday and Sunday's). Because I got terminated because of disability so we (whole family) HAD to move, she had to quit all three jobs. For months she worked at Law Office of Marina Trubitsky as an intern, for free. She wanted to get hired at Law Office of Marina Trubitsky so badly. Around September 2017, she was getting pay by the attorney Marina Trubitsky. It was my wife's dream job. Because we had to move, she left all three jobs.

My son, Bledi Kastrati, as I mention above, from when it was attacked by group of people, he had a brain injury, he suffers from mental illness. My son, Bledi Kastrati permission to use his mental condition, signed by Bledi Kastrati is attached as **Exhibit U**. When he began his higher education, he is seeing a therapist every two weeks, a psychiatrist, once a month. When we moved to New Britain, CT, he went 4 times at emergency room at UCON Hospital to get refills of his medication. For the first time when I send my son at UCON Hospital, a doctor gives him address and phone number to call to make appointment. Usually, my wife takes care of these kinds of things, she called and left a message many times, no one called back. It was time to get a new medication refill. I sent my son for second time at emergency room, same thing, no one called back. Third time, again, I sent my son for refills and to find a psychiatrist and therapist. Finally, someone from the UCON Hospital called and he got the appointment. Therefore, the

appointment was too far, and he needed his medication; I sent him for the fourth time at emergency room at UCON Hospital. Believe or not, at the UCON Hospital ER told my son do not come anymore for your refills. He told the hospital stuff the reason, they still didn't mind, you cannot come only for your refills. Finally, he had someone to prescribe his medication. Second month which he was seeing a doctor to prescribe his medication, my car broke. Because of it, my son missed appointment. My wife called the place, left a message, no one called back. We must find another hospital to send my son for refills. Because we didn't know the place well where we moved, New Britain, CT, we had hard time to know where the hospitals, food markets, etc., are. My wife found online The Hospital of Central Connecticut which I sent him on 05/18/2018. Finally, we found a place to go and have his treatment at Wheeler Clinic which wasn't too far from the place where we live now. Anyway, because he didn't have enough medication in need, and his appointment was far, he must go for medication refill again at ER. He went to The Hospital of Central Connecticut on 07/27/2018, New Britain, CT. I will not include any of his ER hospitalization because of his condition. From the time when we moved to New Britain, CT, because of having problem finding a doctor for my son, he used his meds only when he felt withdrawals system. My son used to go at BMCC College in New York. Because we moved on January 20, 2018 to a totally new State/place, he missed one semester. Now, he is at Central State University, New Britain, CT. He is behind one semester.

Because, we moved far away from New York, my wife had to leave all her three jobs. It was impossible for her to take a bus or train everyday to get to New York and back. She couldn't let her family behind. We didn't have any income for two months. She went for food assistant, they didn't give it to us because my son, Bledi Kastrati, was getting less than $90 a month food assistant from New York. My wife and my son called a few times to stop food assistant, we even went all the way to Brooklyn, at the place where my son applied to stop receiving the food assistant from New York, they didn't stop. We have had less than $90 a month to buy food. One day my wife went to send some more documents to the New Britain Food Stamps Department, they told her that our family application is declined because the food assistant from New York was still active. And, she needs to start the application from the beginning. My wife asked if there are any other options to help because we did not have any income to buy food. From the food assistant place, The Manager told her that: "there is no other option, you have to apply from the beginning". My wife demanded help right away. They called security from her office and had her escorted by security to leave the food stamps premises. We didn't have much to eat we

starved ourselves. We went to sleep hungry, we woke up and didn't have what to eat. My sister, Sadia, payed for our rent, she gave us as much as she could. My wife's two friends from New York send us $100 each. Finally, I got a letter from New York food stamps that food stamps were stopped. Finally, we started to get food stamps from Connecticut. At around of end of March I start getting payed from unamployment. For two-three months, we didn't have what to eat, at night we went to bed hungry. In the morning we woke up with no food to eat, it was the worst time for anyone to go thru from what we went thru. One evening, my wife and my younger son went to walk the dog, Angel. He told my wife/his mother: "I am praying to the God that everything is happening to us, the God too get retaliation on everyone who made us suffer". Around end of March of 2018, my wife and my older son were accepted at Stop and Shop store in Berlin, CT. We needed my older son to come live with us because my wife doesn't drive. Because, we didn't know even where the bus is. We didn't know if there is a bus. We didn't know anything. Because, we didn't have any income, we couldn't afford to pay internet and find the needs for our family. We didn't know no one around us. My sister, Sadie, lives at West Hartford. She didn't know much for New Britain also.

When we found a new place, New Britain, CT, it was around the end of the December 2017, or it was on beginning of January 2018. My wife called the dialyses facility near New Britain to make an appointment ready for his required dialysis treatment. She told them that on January 22, 2018, my husband Refki Kastrati needs a dialyses treatment facility. They told my wife that the dialyses facility would be ready for Monday January 22, 2018. When I went on Monday January 22, 2018, at the two dialysis facilities around me, those two places gave my wife the address for the facilities, no one had my name on their scheduled list. Because, we needed to carry many things to the truck, and when we arrived, we had to carry everything out of the truck at our new place at New Britain, CT, as soon as we arrived, we were so tired from unloading the truck and the trip was very long. Because, we moved to a new place, on Monday January 22, 2018, I didn't/couldn't get my treatment, I couldn't breathe, on Tuesday January 23, 2018, I went to the Emergency Room at UCON Hospital. I was in critical health condition. I missed my dialysis treatment many times because my insurance ride failed to show up at my house to bring me to my appointment and failed many times to bring me back home because I couldn't breathe, I needed to go to ER to get dialyses treatment few times. There are not trains like in New York or bus to get to dialyses facility. It really hurt a lot when you can't breathe.

Because of all the suffering, my wife couldn't eat or sleep. She went two times to The Hospital of Central Connecticut. The first time, June 5, 2018, at ER, they told her that she must stay at the hospital for a long time to prescribe her the medication. Because, she was working at Stop and Shop, Berlin, and was getting payed minimum wage, $10.10 per hour, she couldn't get more than 25 hours a week because she doesn't have a year working there and if she stays at the hospital, she wouldn't get payed, we couldn't afford to lose one hour, and not a day or a week. She couldn't sleep or eat for weeks; for two weeks she lost 13 pounds, so, she goes back at the same hospital on July 25, 2018. She told the hospital staff/nurse the situation that she cannot afford to lose much work hours. She stayed at the hospital overnight. She was prescribed finally with medication and start to see a psychiatrist at Wheeler Clinic at New Britain, CT. Find a copy of my wife permission of diagnosis and medications which she is taking as **Exhibit V**.

When I went to sleep, I wish I will not wake up anymore, when I go to my treatment and get under those machines, I wish my heart will stop working. When I shave, I see a sick person who can't provide for his family. I know I am depressed, but because I must start from beginning in Connecticut for my kidney transplant, I can't see a psychiatric because I do not have any time. I have to go thru many check-ups for my kidney transplant. I don't know why, but in this place, I am EXTREMELY exhausted/tired after my treatment. I had a pimple on my left side close to the ear. It was very small when doctor at dialyses facility in Brooklyn give me a referral to see a skin specialist. Because I was afraid to take a day off, I tried to be at worksite as much as I could have, I didn't, I couldn't go and see a skin specialist. When I started to register for a new kidney transplant at Connecticut, the doctor gave me a referral to have a biopsy of that small pimple which was spreading so fast, much, much bigger than when a doctor at Brooklyn give me a referral about it. I was told that I have skin cancer and I needed an operation. I had the skin cancer operation on Tuesday, October 30, 2018. If I didn't have had so much pressure from Gloria, the operation to remove the skin cancer it would have been much, much smaller. I am not sure how big it is yet because it is still covered.

I want to write more, but because of the Statute of Limitation, not much time to explain everything. There is too much suffering mentally and physically which I and my family went thru. It is not only that we lost our jobs (I and my wife,), I lost my retirement saving 402b, we lost a place, we lost a neighborhood, we had to leave the New York State. My son lost a semester from a college. He had to go every month to ER (6 times) to be prescribed medication. My wife

cannot sleep or eat without medication. Dear Judge/Jury, because all my family went thru a lot, I would like to change: *Refki Kastrati v. Progress of People Management Corp.*, to **Kastrati Family v. Progress of People Management Corp.** By terminating from the position which I held it before, they didn't destroy just my life, they destroyed my family's life. I was terminated from my job only because I require dialyses treatment, just because I cannot be at the work site 24/7. I was targeted to be terminated not because of my work performance but my need for my dialysis treatment .Those complains made against me, false accusations, Gloria flipping my words, Jeanmarie telling my wife the same words which Ms. Mitchell told me, Tim taking a picture of my electric scooter, and not taking a photo of the other things which were stored at gas meter room long time before I was hired for the position; at unamployment hearing, Judge Diane Dubiac, asked Mr. Hurley: ..."when you saw a scooter, did you speak with Refki about the scooter?", Mr. Hurley told to Judge Diane Dubiac: "Yes, I tried to find him, but Refki was nowhere to be found". That is not how it happened, Mr. Hurley called me at the same day when he took a picture of the electric scooter from the security desk, and he asked me: "Can you come downstairs?" (I am not sure if it was before or after he took a picture) I told him that I was at 5th Floor replacing an emergency ballast and I have wires are exposed. As soon as I finish, I will meet you downstairs. When I went downstairs to meet with him, he was gone. And that's how it happened, not as he said at unamployment hearing that he couldn't find me.

All the above Respondents violated Federal, State, and NYC Disability Law. I was unlawfully terminated from the position which I used to hold, which I loved so much. I was accused for things I didn't do; I was told "why you accepted the position if you are not able to be at work site 24/7". I have a hard time to find a new work/job because of my time limitation. All the calls which I got until now, they want a flexible schedule to work. When I tell them that I require a treatment, on Monday, Wednesday, and Friday from 3:30PM to 8:30PM, they saying to me: "sorry but we need someone with flexible schedule". I am not sure if I ever will get a job… My wife graduated from John Jay College wit BA in Law and Society, Associate in Criminal Justice, and History Minor, she works at Stop and Shop for minimum wage. She has a student loan, which she was paying until December 2017. She cannot pay her student loan because she is making minimum wage. We don't have enough earning to pay bills, buy much food. During a summer using air-condition, during a winter using a heat, because I cannot afford all the bills. As I mentioned above, these is not only about me, these is all about one family being emotionally and physically destroyed. One entire family…

**VIOLATIONS OF LAW**

**Disability**

**(Federal, State, and NYC)**

- The above-mentioned Respondents violated Americans With Disabilities Act ("ADA")
- The above-mentioned Respondents violated Title VII of Civil Rights Act of 1964
- The above-mentioned Respondents violate provision of New York State Human Rights Law ("NYSHRL" or "Human Right Law")

The above-mentioned Respondents violated the ADA and Human Rights Law by (1) by termination because of my Disability; (2) by not providing reasonable accommodations to carry out my vocation (3) failing to provide a "reasonable accommodation" because of my disability; and (4) retaliating against me because I exercised my rights under the ADA and Human Rights Law

## IV.  Exhaustion of Federal Administrative Remedies

A.  It is my best recollection that I filed a charge with the Equal Employment
Opportunity Commission or my Equal Employment Opportunity counselor
regarding the defendant's alleged discriminatory conduct on *(date)*

_____

B.  The Equal Employment Opportunity Commission *(check one)*:

☐  has not issued a Notice of Right to Sue letter.

☑  issued a Notice of Right to Sue letter, which I received on *(date)*

_____

*(Note:  Attach a copy of the Notice of Right to Sue letter from the
Equal Employment Opportunity Commission to this complaint.)*

C.  Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment
Opportunity Commission regarding the defendant's alleged discriminatory
conduct *(check one)*:

☐  60 days or more have elapsed.

☐  less than 60 days have elapsed.

## V.  Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to
order.  Do not make legal arguments.  Include any basis for claiming that the wrongs
alleged are continuing at the present time.  Include the amounts of any actual damages
claimed for the acts alleged and the basis for these amounts.  Include any punitive or
exemplary damages claimed, the amounts, and the reasons you claim you are entitled to
actual or punitive money damages.

Loss of my employment (Refki Kastrati): $85,000.00;
loss of retirement benefits (Refki Kastrati): will provide in the
future notice; My wife's employment: $24,000.00; my wife's student
loan payment: will provide in the future notice; My sons (Bledi Kastrati)
lost of se College Semester: $16,000.00. Punitive damages:
$300,000.00.

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: _11 - 19_, 20_18_

Signature of Plaintiff _Refki Kastrati_

Printed Name of Plaintiff _REFKI KASTRATI_

# Exhibit "A"

| | |
|---|---|
| **TO:** | Refki Kastrati, Superintendent II |
| **FROM:** | Gloria Mitchell, Regional Property Manager |
| **DATE:** | 7/18/2017 |
| **RE:** | Verbal Warning |

Per Agency Policy No. 16, *Warning Notice and Probation,* you are being issued a Verbal Warning for your below standard job performance and violation of Agency Policy.

Your job description includes the following as job duties and responsibilities: -- Implement general maintenance and preventative requirements of the building. -- Establish and schedule formal preventative maintenance program in accordance with building requirements and safety codes. -- Brings to the attention of Regional Property Manager any issues which may affect the safety or living conditions of tenants. In addition, you are required to work as an integral member of on-site maintenance to ensure the safe housing is provided and maintained for tenants.... You were scheduled to work on July 3, 2017 per your normal schedule and advised that you would be allowed to request another day off in accordance with the Agency Policy No. 32, Holiday. In the course of reviewing Dayforce to confirm your attendance, I noticed that you did not clock in and out as required on July 3, 2017 despite being expected to work that day. In discussion of your failure to clock in and out, you responded that you did work on that day, but did not clock-in or clock-out as required. You additionally claimed that as that day was an additional holiday for the Agency, the Agency was closed. You were advised that you clocked in as required on July 4, 2017 and were expected to clock-in on each of your assigned work days including July 3, 2017 as you were assigned to provide coverage that day for the building. You then admitted to working only on July 4, 2017 to ensure that the garbage was removed from the Program site. You have been advised of the Agency's policy regarding provision of required services at sites that operate 24 hours as this issue was addressed in regard to your failure to work on May 30, 2017, Memorial Day holiday. You are expected to comply with the requirements of your assigned work schedule to ensure general maintenance in accordance with building requirements. Per Agency Policy No. 8, *Attendance, Attendance Records and Punctuality,* Section II, A): Consistent and on-time attendance is essential for smooth and productive overall program and departmental operations. Section III, B): If an employee is late or absent, she/he must notify the immediate supervisor before normal start time. As such you are expected to provide notice to Management if you will be late or absent so that arrangements can be made to ensure effective maintenance. Your failure to advise Management of your absence and your initial false claim that you worked on July 3, 2017 despite knowing that this was false is indicative of a violation of Agency policy and borders on falsification of Agency Records.

Per Agency Policy No. 16, *Warning Notice and Probation,* part II section (A) when an employee violates an Agency policy or procedure or when an employee's work performance show signs of being below standard it will be the immediate supervisor's responsibility to counsel the employee toward improved performance, first verbally, and subsequently, in writing. This will therefore serve as the Verbal Warning.

Corrective Action:
- You are expected to work your assigned work schedule to ensure effective maintenance and Program site safety needs.
- You are required to advise your immediate supervisor if you will be absent or sick prior to your normal work schedule start time.
- You are required to effectively communicate all issues or concerns to your immediate supervisor or Management for resolution inclusive of work schedule changes or time off requests.
- You are required to provide accurate information regarding all job activities and work schedules.
- You are required to adhere to all Agency policies and procedures.

If this pattern of poor performance continues, or you fail to adhere to agency policies and practices, you will be subject to further disciplinary action, up to and including termination of employment.

I have read and understood the above:

Employee Signature: *Refki Kastrati*          Date: 7-19-17

Supervisor Signature: *G. Mitchell*          Date: 7/19/17

Cc:     Stanley Cellus, Vice President, POP Management
        HR Employee File

# Exhibit "B"



## Catholic Charities Brooklyn and Queens & Affiliated Agencies
### MEMORANDUM

| | |
|---|---|
| TO: | Rafki Kastrati, Superintendent II |
| FROM: | Gloria Mitchell, Regional Property Manager |
| DATE: | September 12, 2017 |
| RE: | Final Written Warning & Probation In Lieu of Termination |

As per Catholic Charities Neighborhood Services Personnel Policy No. 9 Employee Conduct, you are hereby being issued a Final Warning and being placed on probation for a period of 90 days in lieu of termination for (misconduct). The probationary period will began at September 12, 2017 and continue until December 12, 2017.

Your Job description includes the following as job duties and responsibilities: -- Implement general maintenance and preventative maintenance requirements of the building. -- Bring to the attention of Regional Property Manager any issues which may affect the safety or living conditions of tenants. -- Collaborate as part of team responsible to ensure that the building provides a safe and healthy environment for its residents; remain up to date on basic safety standards. --Respond to 24 hour facility emergencies following Agency procedure. --Conduct building tours; represent building and agency best practices. Your job description indicates that specifications for your position as Superintendent include: -- Ability to work a flexible schedule providing evening, weekend and holiday coverage. -- Ability to respond to 24 hour emergency phone. You are expected to demonstrate safe and timely maintenance of the Program site, respond to all issues that may affect the safety of the tenants and staff and provide immediate communication of any issue or concern that may affect the safety of tenants. In addition, you are expected to follow all directives to provide all tasks to ensure the preventative maintenance and a safe environment for tenants, staff and visitors. You, however continue to fail to demonstrate the provision of required maintenance and continued attention all directives issued to you to ensure a safe and effectively maintained site.

You have been advised to respond to emails sent to you by POP Management staff. You, however, have not taken the steps to ensure your continued communication and response via email to ensure resolution of job tasks and site environment requirements. In addition, you continue to fail to meet the requirements for building repairs to meet all Program and oversite requirements from multiple administrative Agencies including HUD. You failed to complete assigned repairs in two (2) apartments on August 27, 2017. In discussion of this issue you claimed the tenants were not at home, however, you were not able to provide the work order noting the repairs required or the time you attempted to access the apartments. I was subsequently advised by the tenants that they were in fact available all day. This failure to provide the needed repairs affects the positive interaction with the tenants and you are aware of the upcoming building inspection and the need to ensure inspection standards and building code compliance. You are expected to work your normal assigned work schedule inclusive of providing holiday coverage. On September 4, 2017, you did not work your normal schedule for that day as you only clocked in and out for 4 hours. In discussion of the issue, you said you did not know you had to work a full day. You are expected to provide site coverage on all assigned work days unless approval for time off is provided by me. You have been advised of this previously per the Verbal Warning issued to you July 19, 2017 as you failed to provide site coverage on a holiday.

On September 2, 2017 an Aide assigned to a tenant was stuck in the elevator. You were alerted to this issue by security, and per the statement you provided, you claimed you were not on site at the building location. You indicated that you asked your wife and son to assist in helping the Aide get out of the elevator by following your directives. This action on your part is prohibited as neither your wife nor son has the required authorization to provide this assistance. In addition this attempt to free someone from the elevator could have resulted in injury to your wife or son. You were expected to follow the emergency protocol, and immediately report this incident to me if you could not provide the immediate assistance. In the event that I was not immediately available you were expected to follow the POP management protocols for 24 hour emergency reporting. In addition, you failed to provide notification of an elevator service issue as I only became aware of this incident on receipt of the security services report. On September 3, 2017 you failed to provide assistance to a tenant who was locked out despite being on site when this occurred. You claimed you were not on site at the building location when the tenant subsequently went to your apartment directly for assistance. Your son had access to the master keys and opened the door so that the tenant could gain access to her apartment. Your failure to provide 24 hour facility emergency response to address and resolve emergencies reported to you and to demonstrate sound judgment and compliance with tenant safety requirements constitutes poor performance, negligence or endangering the welfare of a client, and conduct detrimental to the Agency. You were expected to provide the assistance to the tenant and then notify me of this issue for resolution if there was an issue or concern. In addition, you are the only person authorized to have access to the master keys. Your family members are not authorized to provide assistance to tenants or have access to the master keys.

On September 6, 2017 following the incident of you being stuck in the elevator, the elevator company was advised of the issue and the technician arrived at the Program site at approximately 6:30pm. You, again, did not provide the assistance to the technician as the on-site staff responsible for building safety and representation as you instead sent your son to assist the technician. This is indicative of your continued failure to ensure a safe building environment and shows a lack of concern for ensuring effective on-site maintenance via discussion with the technician to resolve elevator performance issues. In addition, your family members are not authorized to provide any maintenance, compliance with building requirements or allowed to meet safety standards resolution or requirement. You, as the superintendent, are expected to respond and collaborate as part of the team providing maintenance, safety and as necessary the 24 hour response to all building emergencies. Your actions constitute: 2) Negligence or endangering the welfare of a client, visitor or another employee and conduct detrimental to the Agency. Agency Personnel Policy 9 states that an employee may be subject to summary (immediate) discharge for misconduct in this area. However, it has been determined that you will be issued the Final Warning and placed on probation in lieu of termination.



Catholic Charities Brooklyn and Queens & Affiliate Agencies
MEMORANDUM

**Corrective Action:**

- You are required provide maintenance in compliance with all safety standards to ensure the wellbeing of tenants, staff and visitors to the Program site.
- You are expected to provide immediate notification to your supervisor or POP Management staff of any issue or emergency incident.
- You are required to respond to 24 hour facility emergencies following Agency procedures.
- You are expected to seek assistance in resolving any work or schedule issue to ensure a safe and healthy program site.
- You are expected to adhere to all Agency policies and procedures.

If during this period, the pattern of poor performance continues or you fail to adhere to Agency Policies & Procedures, you will be subject to further disciplinary action, up to and including termination of employment.

I have read and understood the above:

Employee Signature: _Lathi Kartins_  Date: _9-12-17_

Supervisor Signature: _M. Mitchell_  Date: _9.12.17_

Cc:  Stanley Cellus, Vice President POP Management
     HR/Employee File

# Exhibit "C"

**Bay Ridge Security Service Inc.**

Jobsite Name & Location:

*Mary Star of the Sea*
*41 1st street Brooklyn NY 11231*

## PRELIMINARY INCIDENT REPORT

Incident Date: *September 2nd, 2017*          Time of occurrence *4:30 AM*

Location of Incident *4th Floor large elevator*
(Identify where on the property the incident occurred; e.g. Apt.#., hallway, elevator, etc.)

Type of Incident (check all that apply) :

☐ Sick call/ambulance case  ☐ Injury to person  ☐ Damage to property  ☐ Fire/Smoke

☐ Utility problems (Gas, electric, water)  ☐ Trespassers in Building  ☐ Criminal Acts

☐ Unusual or Suspicious Activity  ☒ Unsafe condition  ☐ Other:

### Sick Calls, Injuries & Ambulance Cases

Name of Sick/ Injured: *No Injury/Unknown person.* Apartment No. *Unknown*

If injured, how did the injury happen? *no injury*

Removed to hospital?  ☐ Yes ☒ No  Name of hospital: *N/A*

Removed by: *no one removed*  Name and/or badge # *ladder 131*

### All Incidents

This incident was ☐ observed by me. ☒ reported to me by *a tenant*

The condition observed or reported was:

*Someone is stuck in the large elevator on the 4th floor.*

I took the following action:
*I called the building super to inform him of the situation. I then called BRS office and was told if nothing is done to call 911 and the building coordinator. The super's wife tried to open the door but was unable to. I called 911*

The following responded to this incident: ☒ FDNY ☒ NYPD ☐ EMS ☐ Utility Company *after I*

☐ Elevator Company ☐ Security Supervisor ☒ Bld'g. Sup't. ☐ Porter ☐ Housing Coordinator *called 911*

Other witnesses to this incident are ☐ unknown at this time. ☒ the following: *The supers let out before the people were*
*son and wife, the head of BRS operations he also FDNY arrived.*
*Shutting power to the elevator.* *FDNY is*

Signature of Person Making this Report: *Max Bartels*          Dated *September 2nd, 2017*
Print Name Below Signature-------- > *Max Bartels*

**RECORD FURTHER DETAILS, IF ANY, IN THE SECURITY LOGBOOK **

DISTRIBUTION: Original to on-site management office;  Copy to Security Supervisor

# Exhibit "D"

*▓▓ Thrive On*

## NEPHRO CARE WEST

*358-362 Fourth Avenue Brooklyn, NY 11215*

*Tel.: 718-858-6675   Fax: 718-858-4988*

Date: 11/9/17

Re: Refki Kastrati

D.O.B. 9/22/67

*To Whom It May Concern:*

*The above named patient is under medical supervision at FMC Nephro Care West for the treatment of End Stage Renal Disease. This patient receives life sustaining dialysis treatment three times weekly for approximately three hours per treatment. This treatment is life-long or until a replacement kidney can be obtained.*

*Should you have any questions please feel free to call 718-858-6675.*

*Sincerely,*

*Myriam Kalchstein LMSW*

*Nephrology Social Worker*

# Exhibit "E"

# Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)

**U.S. Department of Labor**

Wage and Hour Division



DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT

## SECTION I: For Completion by the EMPLOYER

OMB Control Number: 1235-0003
Expires: 5/31/2018

**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies, and in accordance with 29 C.F.R. § 1635.9, if the Genetic Information Nondiscrimination Act applies.

Employer name and contact: CCBQ    MARY STAR OF THE SEA

Employee's job title: SUPERINTENDENT II          Regular work schedule: _____

Employee's essential job functions: _____

_____

Check if job description is attached: _____

## SECTION II: For Completion by the EMPLOYEE

**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 20 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R. § 825.305(b).

Your name: REFKI          B          KASTRATI

First          Middle          Last

## SECTION III: For Completion by the HEALTH CARE PROVIDER

**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the employee is seeking leave. Do not provide information about genetic tests, as defined in 29 C.F.R. § 1635.3(e), or genetic services, as defined in 29 C.F.R. § 1635.3(e), or the manifestation of disease or disorder in the employee's family members, 29 C.F.R. § 1635.3(b). Please be sure to sign the form on the last page.

Provider's name and business address: NEAL MITTMAN, MD    577 PROSPECT AVE. SUITE 1B    BROOKLYN NY 11215

Type of practice / Medical specialty: NEPHROLOGY AND DIALYSIS

Telephone: ( 718 ) 369 0218          Fax:( 718 ) 369-0290

Page 1

Form WH-380-E Revised May 2015

## PART A: MEDICAL FACTS

1. Approximate date condition commenced: _December 2012_

Probable duration of condition: _Chronic_

**Mark below as applicable:**
Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
✓ No ___ Yes. If so, dates of admission:

_____

Date(s) you treated the patient for condition:

_Every Monday, Wednesday and Friday_

Will the patient need to have treatment visits at least twice per year due to the condition? ___ No ✓ Yes.

Was medication, other than over-the-counter medication, prescribed? ___ No ✓ Yes.

Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
✓ No ___ Yes. If so, state the nature of such treatments and expected duration of treatment:

_____

2. Is the medical condition pregnancy? ✓ No ___ Yes. If so, expected delivery date: _____

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

Is the employee unable to perform any of his/her job functions due to the condition: ✓ No ___ Yes.

If so, identify the job functions the employee is unable to perform:

_Only unavailable during dialysis hours_

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

_Requires hemodialysis treatments twice times a week for 4 hours. Chronic._
_He has been and will be, unavailable only during these life-sustaining_
_treatments_

_____

_____

_____

PART B: AMOUNT OF LEAVE NEEDED

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? ✓ No ___Yes.

   If so, estimate the beginning and ending dates for the period of incapacity: _____

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? ___No ✓ Yes.

   If so, are the treatments or the reduced number of hours of work medically necessary? ___No ✓ Yes.

   Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

   Every Monday, Wednesday and Friday 4PM – 8:30

   Estimate the part-time or reduced work schedule the employee needs, if any:

   _____ hour(s) per day; _____ days per week from _____ through _____

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? ✓ No ___Yes.

   Is it medically necessary for the employee to be absent from work during the flare-ups? _____ No _____Yes. If so, explain:

   _____

   _____

   Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency           : _____ times per _____ week(s) _____ month(s)

          Duration: _____ hours or ___ day(s) per episode

ADDITIONAL INFORMATION: IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____          _____
**Signature of Health Care Provider**          **Date** 4/10/17

### PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. **DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.**

Form WH-380-E Revised May 2015

# Exhibit "F"

11-8-17

In this date, on my way to sign out and to talk to my supervisor Gloria, i got a phone col from Gloria to talk. I wanted to talk about my vacation days requested two weeks before, Instad we storted with something else. I was asked where was I in the morning of same day, i told Gloria that I was on the roof and staircase inspectin lights Gloria told me i am "lying" because she did not see my car and the gate was oppend witch i did not know who left it oppend my son took the car to go in the store and come back in 10-15 minutes, could be bus drivere leftit oppen

Another question from Gloria was why an i not wrighteen on the paper what am i doueing in my shift. I toled Gloria that I dont wright english i dont know I am not dueing something I am not good. Gloria told me to leave here office. I left the office afte that it was not cleare to me if i was fired from the job, i went back to ask Gloria if i am fired she told me live my office and dont thretten me. I left

Also in the previous conversation I was on my vacation I was given final notice before tereminations because

i sent my son to oppere elevatore dor, some tenant got stuck inside elevatore and another day when I was in dialyses for my treatment some tennant got lockt out of appartment I sent my whife to oppen the dore for tenant. Gloria told me why did I took this job if you are in dialyses do you know that you have to be 24 hours availeble.
I sign that notice without knowing what am i signin

Refli Korbati

# Exhibit "G"

# KRIS IOVINO

**From:** Gloria Mitchell
**Sent:** Wednesday, November 08, 2017 5:00 PM
**To:** KRIS IOVINO; IGNATIA CARASCO
**Cc:** STANLEY CELIUS
**Subject:** RE: Kastrati, Refki  Superintendent  Mary Star of the Sea Appts

Good afternoon,

Below, please find my account of my conversation with Rekfi this afternoon.

Please note that I asked John to write a statement and he refused, but he verbally gave me the same account of what we discuss in my statement below.

There is no other staff at the site that witnessed our conversation.

I arrived at Mary Star of the Sea this morning at 8:45am. Upon my arrival I met the staff parking lot gate open and the back door leading to the building also open. I closed the gate and proceeded to the building when porter (John Belfon) came out of the open back door. I asked John did he leave the back gate and door open and he replied "no" he was checking to see what was going on because he felt a cold draft in the basement. He also stated "Refki's car is gone; maybe he left to take his son to somewhere". After collecting documents needed for court I proceeded out of the building into the parking lot at 9:10am. Refki's car was back in parking lot and both the gate side door looked. I called Refki in the office at 2:58pm to discuss the gate and back door being left open. I advised Refki what I saw when I arrived at the property this morning as stated above. Refki advised me that his son used his car to go buy cigarettes at a store 5mins from the site. He also advised me that it was his son that left the gate and back door open. I asked him where was he at the time that all of this took place and first he said he was in the basement. I asked him what he was doing he said checking things out. I asked him what things and for proof then he said he was in the apartments checking things out. I asked again for work orders and he could not produce them. Finally he said he was on the roof. I advised Refki at that point that I do not believe what he telling me because he gave me 3 different stories of location at that time. He said "you don't have to buy it, I do not lie". He advised me that he does not know how to lie. I asked him to provide me with a statement of what took place this morning. He advised me that he cannot write. He said he would do it when his son gets home. Then he advised me that at 11:00am that he was working in unit 4P, I asked him for the work order and he said he did not create one. I reminded him of our conversation and meeting on 9/5/17, where he was advised to create work orders maintenance repairs at the site. He said he would go back now to create one. I reminded him that he must consistently create work orders to when completing repairs in the building and he advised me that if that is what he must do then I could fire him now. At that point I told him our meeting was over and he could leave my office.

Thank you,

  Join b+q

**Gloria Mitchell**
Regional Property Manager, Progress of Peoples Management Corp.
*Affiliate of Catholic Charities, Brooklyn & Queens*
191 Joralemon Street | Brooklyn, NY 11201
C:347.524.5260 E-Mail: gloria.mitchell@ccbq.org | www.ccbq.org

1

# Exhibit "H"

**11-9-2017 INCIDENT REPORT**

I arrived at work at 8am. At that time, the parking lot gates were closed. I parked my car in the front of the building and entered through the main entrance.

At 8:30am, I went to the basement and felt a draft. I noticed that the basement doors were open. I walked outside and also noticed that the parking lot gates were open.

I met our supervisor, Gloria, in the parking lot. She asked if I had left the parking lot doors open for someone. I informed her that I did not open them, but that I noticed they were left open.

*John Belfron*

John Belfron, *Maintenance*

# Exhibit "I"

# Notice of Eligibility and Rights & Responsibilities
## (Family and Medical Leave Act)

**U.S. Department of Labor**
Wage and Hour Division



U.S. Wage and Hour Division

OMB Control Number: 1235-0003
Expires: 5/31/2018

In general, to be eligible an employee must have worked for an employer for at least 12 months, meet the hours of service requirement in the 12 months preceding the leave, and work at a site with at least 50 employees within 75 miles. While use of this form by employers is optional, a fully completed Form WH-381 provides employees with the information required by 29 C.F.R. § 825.300(b), which must be provided within five business days of the employee notifying the employer of the need for FMLA leave. Part B provides employees with information regarding their rights and responsibilities for taking FMLA leave, as required by 29 C.F.R. § 825.300(b), (c).

## [Part A – NOTICE OF ELIGIBILITY]

TO: <u>Refki Kastrati</u>
Employee

FROM: <u>Tara Kissiondial</u>
Employer Representative

DATE: <u>November 14, 2017</u>

On <u>November 9, 2017</u>, you informed us that you needed leave beginning on <u>November 13, 2017</u> for:

_____ The birth of a child, or placement of a child with you for adoption or foster care;

__✓__ Your own serious health condition;

_____ Because you are needed to care for your _____ spouse; _____child; _____ parent due to his/her serious health condition.

_____ Because of a qualifying exigency arising out of the fact that your _____ spouse; _____son or daughter; _____ parent is on covered active duty or call to covered active duty status with the Armed Forces.

_____ Because you are the _____ spouse; _____son or daughter; _____ parent; _____ next of kin of a covered servicemember with a serious injury or illness.

This Notice is to inform you that you:

__✓__ Are eligible for FMLA leave (See Part B below for Rights and Responsibilities)

_____ Are not eligible for FMLA leave, because (only one reason need be checked, although you may not be eligible for other reasons):

     _____ You have not met the FMLA's 12-month length of service requirement. As of the first date of requested leave, you will have worked approximately ____ months towards this requirement.
     _____ You have not met the FMLA's hours of service requirement.
     _____ You do not work and/or report to a site with 50 or more employees within 75 miles.

If you have any questions, contact <u>Tara Kissiondial 718-722-6183 or tara.kissiondial@ccbq.org</u> or view the FMLA poster located in <u>enclosed</u>.

## [PART B-RIGHTS AND RESPONSIBILITIES FOR TAKING FMLA LEAVE]

As explained in Part A, you meet the eligibility requirements for taking FMLA leave and still have FMLA leave available in the applicable 12-month period. **However, in order for us to determine whether your absence qualifies as FMLA leave, you must return the following information to us by** _____. (If a certification is requested, employers must allow at least 15 calendar days from receipt of this notice; additional time may be required in some circumstances.) If sufficient information is not provided in a timely manner, your leave may be denied.

_____ Sufficient certification to support your request for FMLA leave. A certification form that sets forth the information necessary to support your request ____ is/____ is not enclosed.

_____ Sufficient documentation to establish the required relationship between you and your family member.

_____ Other information needed (such as documentation for military family leave): _____

_____

_____

_____ No additional information requested

If your leave does qualify as FMLA leave you will have the following responsibilities while on FMLA leave (only checked blanks apply):

✓ Contact **Tara Kissiondial** _____ at 718-722-6183 or 6128 _____ to make arrangements to continue to make your share of the premium payments on your health insurance to maintain health benefits while you are on leave. You have a minimum 30-day (or, indicate longer period, if applicable) grace period in which to make premium payments. If payment is not made timely, your group health insurance may be cancelled, provided we notify you in writing at least 15 days before the date that your health coverage will lapse, or, at our option, we may pay your share of the premiums during FMLA leave, and recover these payments from you upon your return to work.

✓ You will be required to use your available paid ✓ sick, ✓ vacation, and/or _____ other leave during your FMLA absence. This means that you will receive your paid leave and the leave will also be considered protected FMLA leave and counted against your FMLA leave entitlement.

___ Due to your status within the company, you are considered a "key employee" as defined in the FMLA. As a "key employee," restoration to employment may be denied following FMLA leave on the grounds that such restoration will cause substantial and grievous economic injury to us. We ___ have/___ have not determined that restoring you to employment at the conclusion of FMLA leave will cause substantial and grievous economic harm to us.

✓ While on leave you will be required to furnish us with periodic reports of your status and intent to return to work every **30 days to your manager.** (Indicate interval of periodic reports, as appropriate for the particular leave situation).

If the circumstances of your leave change, and you are able to return to work earlier than the date indicated on the this form, you will be required to notify us at least two workdays prior to the date you intend to report for work.

If your leave does qualify as FMLA leave you will have the following rights while on FMLA leave:

- You have a right under the FMLA for up to 12 weeks of unpaid leave in a 12-month period calculated as:

  _____ the calendar year (January – December).

  _____ a fixed leave year based on _____

  ✓ the 12-month period measured forward from the date of your first FMLA leave usage.

  _____ a "rolling" 12-month period measured backward from the date of any FMLA leave usage.

- You have a right under the FMLA for up to 26 weeks of unpaid leave in a single 12-month period to care for a covered servicemember with a serious injury or illness. This single 12-month period commenced on _____

- Your health benefits must be maintained during any period of unpaid leave under the same conditions as if you continued to work.
- You must be reinstated to the same or an equivalent job with the same pay, benefits, and terms and conditions of employment on your return from FMLA-protected leave. (If your leave extends beyond the end of your FMLA entitlement, you do not have return rights under FMLA.)
- If you do not return to work following FMLA leave for a reason other than: 1) the continuation, recurrence, or onset of a serious health condition which would entitle you to FMLA leave; 2) the continuation, recurrence, or onset of a covered servicemember's serious injury or illness which would entitle you to FMLA leave; or 3) other circumstances beyond your control, you may be required to reimburse us for our share of health insurance premiums paid on your behalf during your FMLA leave.
- If we have not informed you above that you must use accrued paid leave while taking your unpaid FMLA leave entitlement, you have the right to have ___ sick, ___ vacation, and/or ___ other leave run concurrently with your unpaid leave entitlement, provided you meet any applicable requirements of the leave policy. Applicable conditions related to the substitution of paid leave are referenced or set forth below. If you do not meet the requirements for taking paid leave, you remain entitled to take unpaid FMLA leave.

  _____For a copy of conditions applicable to sick/vacation/other leave usage please refer to _____ available at: _____.

  _____Applicable conditions for use of paid leave:

  _____

  _____

  _____

  _____

Once we obtain the information from you as specified above, we will inform you, within 5 business days, whether your leave will be designated as FMLA leave and count towards your FMLA leave entitlement. If you have any questions, please do not hesitate to contact:

**Tara Kissoondial** at **Benefits@cbq.org**

PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT
It is mandatory for employers to provide employees with notice of their eligibility for FMLA protection and their rights and responsibilities. 29 U.S.C. § 2617; 29 C.F.R. § 825.300(b), (c). It is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 10 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. DO NOT SEND THE COMPLETED FORM TO THE WAGE AND HOUR DIVISION.

Form WH-381 Revised February 2013

Designation Notice
(Family and Medical Leave Act)

U.S. Department of Labor
Wage and Hour Division



OMB Control Number: 1235-0003
Expires: 5/31/2018

U.S. Wage and Hour Division

Leave covered under the Family and Medical Leave Act (FMLA) must be designated as FMLA-protected and the employer must inform the employee of the amount of leave that will be counted against the employee's FMLA leave entitlement. In order to determine whether leave is covered under the FMLA, the employer may request that the leave be supported by a certification. If the certification is incomplete or insufficient, the employer must state in writing what additional information is necessary to make the certification complete and sufficient. While use of this form by employers is optional, a fully completed Form WH-382 provides an easy method of providing employees with the written information required by 29 C.F.R. §§ 825.300(c), 825.301, and 825.305(c).

To:  Refki Kastrati

Date:  11/14/2017

We have reviewed your request for leave under the FMLA and any supporting documentation that you have provided.
We received your most recent information on _____ 11/13/2017 _____ and decided:

____✓___  Your FMLA leave request is approved. All leave taken for this reason will be designated as FMLA leave.

The FMLA requires that you notify us as soon as practicable if dates of scheduled leave change or are extended, or were initially unknown. Based on the information you have provided to date, we are providing the following information about the amount of time that will be counted against your leave entitlement:

___✓___  Provided there is no deviation from your anticipated leave schedule, the following number of hours, days, or weeks will be counted against your leave entitlement: _____ Intermittently _____

_____  Because the leave you will need will be unscheduled, it is not possible to provide the hours, days, or weeks that will be counted against your FMLA entitlement at this time. You have the right to request this information once in a 30-day period (if leave was taken in the 30-day period).

Please be advised (check if applicable):
_____  You have requested to use paid leave during your FMLA leave. Any paid leave taken for this reason will count against your FMLA leave entitlement.

_____  We are requiring you to substitute or use paid leave during your FMLA leave.

_____ You will be required to present a fitness-for-duty certificate to be restored to employment. If such certification is not timely received, your return to work may be delayed until certification is provided. A list of the essential functions of your position ___ is ___ is not attached. If attached, the fitness-for-duty certification must address your ability to perform these functions.

_____  Additional information is needed to determine if your FMLA leave request can be approved:

_____  The certification you have provided is not complete and sufficient to determine whether the FMLA applies to your leave request. You must provide the following information no later than _____, unless it is not
(Provide at least seven calendar days)
practicable under the particular circumstances despite your diligent good faith efforts, or your leave may be denied.

_____
(Specify information needed to make the certification complete and sufficient)

_____  We are exercising our right to have you obtain a second or third opinion medical certification at our expense, and we will provide further details at a later time.

_____  Your FMLA Leave request is Not Approved.
_____  The FMLA does not apply to your leave request.
_____  You have exhausted your FMLA leave entitlement in the applicable 12-month period.

PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT
It is mandatory for employers to inform employees in writing whether leave requested under the FMLA has been determined to be covered under the FMLA. 29 U.S.C. § 2617; 29 C.F.R. §§ 825.300(d), (e). It is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 10 – 30 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. DO NOT SEND THE COMPLETED FORM TO THE WAGE AND HOUR DIVISION.

Form WH-382 January 2009

# Exhibit "J"



# Exhibit "K"



Changing Lives...
Building Communities ™

December 11, 2017

Refki Kastrati
41 1st Street,
Brooklyn, NY 11231

Dear Mr. Kastrati:

As per Agency Policy # 16 "Warning Notice and Probation," you are hereby terminated from your position as Superintendent II with Catholic Charities Brooklyn & Queens Progress of the People Management. The termination of your employment is due to continued unsatisfactory work performance and violation of Agency Policy. Your last day of work is December 11, 2017.

You were issued a Verbal Warning on July 18, 2017 and a Final Warning and Probation on September 12, 2017. Despite these warnings your work performance has not improved. You job description includes the following and job duties and responsibilities: The Superintendent II works as an integral member of on-site maintenance team to ensure safe affordable housing is provided and maintained for tenants who live in buildings...Collaborate as part of team responsible to ensure that the building provides a safe and healthy environment for its residents; remain up to date on basic safety standards. On November 8, 2017 I arrived at the building at 8:45 AM. The staff parking lot gate was open and the back door leading to the building also open. The porter who was in the basement appeared and stated that he was coming to check where the draft was coming from. It was noticed that your car was not in the parking lot. At approximately 9:10 AM I proceeded out of the building and noticed that your car was back in parking lot and both the gate and door were locked. When I spoke to you, you advised me that your son used your car to go buy cigarettes at a store and that it was your son that left the gate and back door open. When I asked where you were at the time that all of this took place you said you were in the basement checking things out. I asked for worker orders as proof and you then said you were in the apartments checking things out. I asked again for work orders and you could not produce them. Finally, you said you were on the roof.

On November 29, 2017 I was informed that a gasoline powered motor scooter was in the gas meter room. When I questioned you about this you stated that it was your sons. You are aware from the last audit that gas tanks, including motorbikes, are not to be stored indoors. Your actions are in violation of NYC Building Code which states Gas Meter rooms shall at all times be kept clear of all rubbish; and shall not be used for storage purposes, including material or equipment of any kind. You failed to comply with all safety standards and ensure the wellbeing of residents, staff, visitors and the Program site. You also failed to maintain general and preventative required maintenance of the building, follow site process and procedures, and communicate facility issues and emergencies to your supervisor in accordance with your role as Superintendent.

As per Agency Policy #16, Warning Notice and Probation part II section (D),"If the violation of Agency policy or procedure continues while the employee is on probation or if the employee's work performance does not improve significantly during this period the employee will be terminated at the end of the probation period. However, if the employee makes no effort to improve unsatisfactory work performance or continues to violate Agency policy and procedure, the employee may be terminated prior to the end of the probationary period." Due to your poor work performance, the Agency has determined that your continued employment is not mutually advantageous.

As per the Occupancy Agreement for Superintendents, point VII states that in the event of termination, you will vacate the apartment upon five (5) days written notice. You must completely vacate your apartment and turn in all remaining keys on December 16, 2017. As per Agency policy you will receive two weeks' pay in lieu of notice. You are to immediately return all Agency property (ID, keys) to Gloria Mitchell. If you are currently participating in the Agency's health benefits plan you will receive information from the Office of Human Resources regarding continuation of benefits.

I wish you luck and success in your future endeavors.

Sincerely,

Gloria Mitchell
Regional Property Manager

cc:    Stanley Celius, Vice President Pop Management
        Office of Human Resources

# Exhibit "L"

# jackson|lewis.

Jackson Lewis P.C.
666 Third Avenue
New York, New York 10017
Tel 212 545-4000
Fax 212 972-3213
www.jacksonlewis.com

| | | |
|---|---|---|
| ALBANY, NY | MONMOUTH COUNTY, NJ | RALEIGH, NC |
| ALBUQUERQUE, NM | GREENVILLE, SC | MORRISTOWN, NJ | RAPID CITY, SD |
| ATLANTA, GA | HARTFORD, CT | NEW ORLEANS, LA | RICHMOND, VA |
| AUSTIN, TX | HONOLULU, HI* | NEW YORK, NY | SACRAMENTO, CA |
| BALTIMORE, MD | HOUSTON, TX | NORFOLK, VA | SALT LAKE CITY, UT |
| BIRMINGHAM, AL | INDIANAPOLIS, IN | OMAHA, NE | SAN DIEGO, CA |
| BOSTON, MA | JACKSONVILLE, FL | ORANGE COUNTY, CA | SAN FRANCISCO, CA |
| CHICAGO, IL | KANSAS CITY REGION | ORLANDO, FL | SAN JUAN, PR |
| CINCINNATI, OH | LAS VEGAS, NV | PHILADELPHIA, PA | SEATTLE, WA |
| CLEVELAND, OH | LONG ISLAND, NY | PHOENIX, AZ | ST. LOUIS, MO |
| DALLAS, TX | LOS ANGELES, CA | PITTSBURGH, PA | TAMPA, FL |
| DAYTON, OH | MADISON, WI | PORTLAND, OR | WASHINGTON, DC REGION |
| DENVER, CO | MEMPHIS, TN | PORTSMOUTH, NH | WHITE PLAINS, NY |
| DETROIT, MI | MIAMI, FL | PROVIDENCE, RI | |
| GRAND RAPIDS, MI | MILWAUKEE, WI | | |
| | MINNEAPOLIS, MN | | |

DIRECT DIAL: (212) 545-4041
EMAIL ADDRESS: SHAWR@JACKSONLEWIS.COM

*through an affiliation with Jackson Lewis P.C., a Law Corporation

November 1, 2018

**VIA E-MAIL** mamuqe@hotmail.com
**AND REGULAR MAIL**
Refki Kastrati
297 Clinton Street, 1ˢᵗ Floor
New Britain, CT 06053

Re:   Progress of People's Management Corp.

Dear Mr. Kastrati:

As you know, we are the attorneys for Progress of People's Management Corporation ("POP Management"). We are in receipt of a typed, unsigned, undated letter from you that was conveyed to me in an e-mail entitled "Refki Kastrati document request" on October 30, 2018 from an e-mail account that appears to belong to Xhevahire Kastrati, whom I presume is your wife. If you are represented by counsel, please provide me with his or her contact information. If you are not represented by counsel, I expect any future communications regarding POP Management will come directly from you.

The letter I received on October 30, 2018 requests a building inspection for the apartment complex located at 41 1ˢᵗ street Brooklyn, NY 11231 and states, "Failure of these [sic] request will be used against your client in the Federal Court." POP Management is not aware of, and has not been served with, any lawsuit that you filed in federal court. If you have filed such a lawsuit or plan to do so, you must comply with the Federal Rules of Civil Procedure ("FRCP") and any local civil court rules, including, among other things, applicable rules concerning service of process and discovery requests. The building inspection request conveyed in the letter that I received on October 30, 2018 does not comply with the FRCP. Accordingly, POP Management is denying your request for a building inspection.

Very truly yours,

JACKSON LEWIS P.C.

Ravindra K. Shaw

cc:   Catherine Tucciarello, Esq. (via e-mail)

# Exhibit "M"



# Exhibit "N"

# APPENDIX E

# METERS AND GAS SERVICE PIPING

**E.1 General.** This appendix addresses the requirements for meters and service piping, underground or aboveground, as the piping enters the building. Service piping includes fuel-gas piping, valves, and fittings upstream of the point of delivery. Service piping may include piping supplied by the gas service utility.

**E.2 Gas regulator and gas regulator vent outlets.** Gas meter piping supplying gas to a building at a pressure in excess of ½ psig (3.4 kPa gauge) shall be provided with a regulator that will reduce the pressure of the gas to ½ psig (3.4 kPa gauge) or less prior to entering the gas distribution piping in the building, except where the use of higher pressure is permitted. Where gas distribution pressure in excess of ½ psig (3.4 kPa gauge) is permitted, it shall be regulated not to exceed the maximum pressure level as permitted by the code or the commissioner.

E.2.1 Inside gas meter piping operating at a pressure in excess of 15 psig (103 kPa gauge) shall comply with the following:

1. Where such piping is greater than 4 inches (102 mm) in diameter, the meter piping shall be installed in a properly ventilated meter room of 3-hour fire-rated construction.

2. The maximum distance from the service line valve to the regulator shall be limited as follows:

| SERVICE LINE VALVE SIZE | MAXIMUM DISTANCE (LINEAR FEET OF PIPE) |
|---|---|
| Up through 2-inch (51 mm) pipe size | 4 feet (1219 mm) |
| Over 2-inch (51 mm) through 4-inch (102 mm) pipe size | 8 feet (2438 mm) |
| Over 4-inch (102 mm) through 8-inch (203 mm) pipe size | 15 feet (4572 mm) |
| 10-inch (254 mm) pipe size and larger | 20 feet (6096 mm) |

3. Where these maximum distances cannot be met, the following shall be required:

| FOOTAGE (LINEAR FEET OF PIPE) IN EXCESS OF ABOVE REQUIREMENTS | ADDITIONAL REQUIREMENTS |
|---|---|
| Up to 5 feet (1534 mm) | The meter room shall have 3 hour fire-rating construction and adequate ventilation |
| Over 5 feet (1524 mm) through 10 feet (3048 mm) | Above requirements plus a combustible gas-detection alarm system |
| Over 10 feet (3048 mm) through 15 feet (4572 mm) | Above requirements plus special inspection by the customer, or his or her representative as required by the *New York City Building Code*. |
| Over 15 feet (4572 mm) through 20 feet (6096 mm) | Above requirements plus explosion venting per NFPA 68 and NFPA 69 or alternative ventilation acceptable to the commissioner and automatic gas shutoff devices |
| Over 20 feet (6096 mm) | Above requirements plus suitable fire protection approved by the commissioner |

For new gas installations made in existing structures, the above requirements shall be used to the extent feasible. Alternate designs may be considered by the commissioner.

**E.2.2** When located inside the building, each regulator shall be provided with a vent pipe that leads directly to the outdoor air. The vent pipe shall be sized according to local utility requirements. The vent outlet shall not be located under a window or any opening leading back into the premises or located below any overhang or projection. No gas regulator vent outlet shall be covered over, plugged up, or otherwise obstructed, and all gas vents shall be identified by suitable marking on the outlet on the outside of the building.

**E.2.3** Gas appliance pressure regulators requiring access to the atmosphere for successful operation shall be equipped with vent leading to the outdoors, unless constructed or equipped with a vent-limiting means to limit the escape of gas from the vent opening in the event of diaphragm failure.

**E.3 Gas meter location.** Gas meter location shall comply with the following:

1. When located inside the building, meters shall be located as near as practicable to the point of entrance of the service and, where possible, the meters shall be located in the cellar or basement unless otherwise permitted by the commissioner. The meter location shall be clean, dry, and free of refuse, steam or chemical fumes and located not less than 3 feet (914 mm) from any source of ignition or any source of heat which might cause damage to the meter. Meters shall be adequately protected

against extreme cold or heat and shall be readily accessible for reading and inspection. The area in which the meter is located shall be properly ventilated as per Section E.4. Notwithstanding the foregoing, outside meter installation shall be permitted in areas where the utility company certifies that dry gas is being distributed.

2. No gas meter, other than the replacement of an existing meter shall be located in any boiler room or other room or space containing a heating boiler, in any stair hall, nor in any public hall above the cellar or above the lowest story if there is no cellar. However, where there is an existing gas meter located in any boiler room or other room or space containing a heating boiler, one additional gas meter may be installed in such room or space, provided such additional gas meter is installed adjacent to the existing gas meter and is used in conjunction with the supply of gas for a gas-fired heating boiler or a gas-fired water heater used as a central source of supply of heat or hot water for the tenants. Such additional gas meter may be installed only upon the condition that space heaters or hot water appliances in the tenant spaces are eliminated.



3. Gas meter rooms, when provided, shall at all times be kept clear of all rubbish; and shall not be used in any way for storage purposes, including material or equipment of any kind. A legible sign reading "Gas meter room---No storage permitted" shall be permanently and conspicuously posted on the exterior of the meter room door, except that the sign may be posted on the interior of the meter room door in Occupancy Group R-3. The lettering of such signs shall be of bold type at least 1 inch (25 mm) in height and shall be properly spaced to provide good legibility. The lettering and background shall be of contrasting colors. Where gas meters and related equipment are not located in a separate room but are located in an open floor area, no combustible material shall be stored or kept within 3 feet (1524 mm) of such equipment; nor shall the gas meter be within 3 feet (914 mm) of any heating boiler or sources of ignition and, except Occupancy Group R-3, there shall be a physical barrier required if the room is also used for storage purposes or the like.

4. The installation of gas meter piping shall be made in accordance with the requirements of this code and the local utility company.

5. Piping containing gas with a pressure exceeding ½ psig (3.4 kPa gauge) and the gas service pressure regulator which may be subjected to accidental vehicular impact shall be suitably protected.

**E.4 Gas meter room ventilation.** Any one of the following methods shall be considered sufficient to provide proper ventilation to a room or space in which a gas meter(s) is installed:

1. An opening to the outside air in the wall of such room or space, provided the free area of the opening is not less than 30 square inches (19 321 mm²).

2. A duct having a cross-section area of at least 50 square inches (32 522mm²) of free area and a maximum length of 15 feet (4572 mm) leading to the outside air. If a longer duct is required due to the building construction, the area of the duct should be increased accordingly, subject to the approval of the commissioner. However, under no circumstances shall the means of ventilation for the gas meter room or space be from an adjoining room or space within the building.

The above requirement is not applicable to one- and two-family dwellings, since the gas meter is available for continuous supervision.

**E.5 Gas service piping connections.** Gas service piping connections shall comply with the following:

1. Gas service piping shall be fitted with a gas service line valve, the valve located on the supply side of the meter and service regulator, if a service regulator is required. If a plug-type valve is used, it shall be constructed so as to prevent the core from being blown out by the pressure of the gas. In addition, it shall be of a type capable of being locked in the off position by the local gas utility. When the gas service line valve is inside the building, it shall be in an accessible location within 2 feet (610 mm) of the point where the gas service connection enters the building or at such other location as may be permitted by the commissioner. Where the gas service connection is installed through a building wall below ground, it shall be protected with a wall sleeve extending at least 4 inches (102 mm) beyond the outer side of the wall and at least 1 inch (25 mm) beyond the inner side of the wall. The sleeve shall be sealed at both ends to prevent the entry of water and gas. Gas service connections, installed through ground slab construction, shall be protected with a floor sleeve sealed at both ends to prevent the entry of water and gas. The sleeve shall extend at least 4 inches (102 mm) above the floor, and shall be installed as specified by the utility company providing the service. It shall terminate at least 4 inches (102mm) outside the building.

2. In all high-pressure areas, the utility company providing the service may inspect the gas service line valve and regulator in accordance with the provisions of 16 NYCRR Part 255 in addition to the department in accordance with Section 406 of this code.

3. No gas service shall enter a structure at a horizontal distance of less than 10 feet (3048 mm) from the cellar termination of a stairway, nor shall any gas meters or gas regulators be located less than 10 feet (3048 mm) from such stairway termination. Where such services, meters and regulators are separated from the stairway termination by a permanent partition or wall having a fire-resistance rating of at least 1 hour, the foregoing shall not apply. Unless forbidden by other provisions of this code, locations under a stairway are exempt from this requirement.

4. When the structure is erected on fill or on piles, provision shall be made to preclude possible damage to the gas service piping caused by settlement.

5. The installation of gas service piping shall be made in accordance with the requirements of the utility corporation providing the service as regulated by the provisions of 16 NYCRR Part 255. Further, such installation shall meet the requirements of the department.

6. Gas service piping outside a structure shall be installed not less than 24 inches (610 mm) below grade, except that a lesser distance of not less than 18 inches (457 mm) may be permitted, provided the piping is adequately protected in accordance with the requirements of this code and the utility corporation supplying service, and the piping is not located below a driveway. Any piping that is exposed to outdoor temperatures or installed underground with a cover of less than 2 feet (610 mm) shall be protected against frost, except that frost protection may be omitted in areas where the utility company certifies that dry gas is being distributed.

E.6 Outside gas cut-off. Outside gas cut-off shall comply with the following:

1. An outside gas service line valve or other outside emergency shutoff device or other means acceptable to the commissioner and the Fire Commissioner shall be installed in every gas service pipe outside the building. If buried, such valve, device or method shall be readily accessible from grade. Every existing service which is being replaced or refurbished shall be provided with such valve, device or means, but in any event, all existing gas services shall be provided with such valve, device or method by January 1, 2010. However, in R-3 occupancy the completion date shall be January 1, 2020. The utility company shall provide the Fire Department with suitable tools for operation of such emergency shutoff valves, devices or means. The number of such tools required for supplying Fire Department units shall be determined by the Fire Department. On or before January 31, of each year, the utility company shall report to the department and the Fire Department the actual number of emergency shutoff valves installed for the preceding year.

2. If the outside gas service line valve, emergency shutoff device or means is located below ground, it shall be installed in a protective housing, and a cover, easily identifiable shall be provided for the housing. The cover shall be flush with the surface of the ground and kept clear at all times so as to be accessible for immediate use.

3. The valve or emergency shutoff device shall be capable of being readily operated by removing the cover of the housing and inserting a portable key or other device over the operating end of the valve or emergency shutoff device.

4. If the outside gas service line valve is located above ground, it shall be suitably protected to prevent accidental vehicular impact and must be installed in accordance with provisions of 16 NYCRR Part 255.

5. Where a gas-fired generator provides required emergency power in accordance with the *New York City Building Code* such generator shall have an outside gas cut-off valve that is separate from other gas services to the buildings. Such valves shall be identified by signage.

# Exhibit "O"

RECEIVED
DEC 1 4 2017
LEGAL

Dear Office of Human Resources:

December 13, 2017

My name is Refki Kastrati, I have currently worked as Superintendent II with Catholic Charities Brooklyn & Queens Progress of the people Management for a duration of five years. On December 11, 2017 I was recently terminated from that position as Superintendent II with Catholic Charities Brooklyn & Queens Progress of the people Management by Ms. Gloria Mitchell. In which I disagree with the decision and I will list below several reasons why.

As the termination letter states: "you will vacate the apartment upon five (5 ) days written notice". Because of my health condition, as well as finding housing for a family of four would be entirely impossible to accomplish in five shorts day, not to mention this it is currently the holiday season. My health/life would be placed in great jeopardy if I do not attend dialysis three times a week. . For several reasons, is why I am requesting at least three month time period in order to find appropriate housing for my family and I and also a new medical center for my dialyses treatment.

I also disagree with Ms. Mitchell decision to terminate me from the position I once held. The following accusations' that has been made by Ms. Mitchell is entirely not true as she describe what took place during each incident. I certainly feel once she found out about my health condition/dialyses treatment she began targeting me in regards to my work performance. Since Ms. Mitchell has mentioned several times "If you are sick why don't you just quit? " When according to my doctor's medical evaluation which in fact states I am not disable from performing my daily job duties. I have been employed for over five years and never once had any complaints, from previous management in regards to my job performance. In fact I was given recognition from The Director of the Catholic Charities by George. I would like to address this accusation more importantly:

1.  On November 8, 2017, Ms. Mitchell stated that she arrived at the site at 8:45 AM. And that the staff parking lot gate was open and the back door leading to the building was also open. My shift begins each day at 7:00 am and ends at 3:00 pm, as Ms. Mitchell is aware. Yet she states since she had not seen my car in the parking lot that was her reason for accusing me of "stealing time" and leaving the gate open. Ms. Mitchell is also currently aware I have an older son and as well as a wife who uses my car often. I was then questioned about my whereabouts during this 25 minute time period of when she made notice of the left open gate and door, as well as my car not being in its parking space. In return I told Ms. Mitchell I was currently doing my rounds in

the building, inspecting buildings' site in order to ensure safe and affordable housing to tenants as I have been doing every day since I have held this position for a period of five years. I was asked for work orders as I stated to her I was not finish my inspection so I could not have possibly provided work orders at that given moment since my job was not complete.

2. On November 29, 2017, Ms. Mitchell stated she was informed that a gasoline powered motor scooter was in the gas meter room. First the scooter is electric scooter and not a gasoline powered motor scooter as mentioned by Ms. Mitchell. The building is also in violations of NYC Building Code which states Gas Meter rooms shall at all times be kept clear of all rubbish; and shall not be used for storage purposes. However there is several storage items including material such as couches which purpose is furniture for the first floor, which was removed and place in the same room "Gas Meter room". There are also file cabinets, documents, building equipment such as refrigerators which purposes are for the tenant's household. On November 29, 2017 why didn't Ms. Mitchell authorize this same Gas Meter room to be cleared and empty for everything that has been listed shows it is clear violate of the Building Code?

Raffi Kashoti


RECEIVED
DEC 1 4 2017
°GAL

Exhibit "P"



electric scooter 1

electric scooter 2

electric scooter 3

IMG_0333

IMG_0334

IMG_0340

IMG_0344

IMG_1883

IMG_1884

IMG_1885

IMG_1886

IMG_1887

IMG_1888

IMG_1889

IMG_1890

vid front gate
open after fired

vid gas door no
key open after
fired

vid gas door
open after fired
no key

vid gas door
open after fired

vid gate open
after fired

vid of old excess
items in gas
room

























# Exhibit "Q"

NYS DEPARTMENT OF LABOR
PO BOX 15131
ALBANY NY 12212-5131



**NEW YORK STATE DEPARTMENT OF LABOR**
**NOTICE OF DETERMINATION TO CLAIMANT**
REDETERMINED DETERMINATION

DATE MAILED: 2/15/2018
SSN: ✶✶✶-✶✶-7037 LO: 881

EMP: PROGRESS OF PEOPLES

REFKI KASTRATI
297 CLINTON ST #1
NEW BRITAIN CT 06053

PLEASE REFER TO THOSE ITEMS WHICH ARE SELECTED [X] BELOW AND READ THE BACK OF THIS FORM

1. [XX] NOTICE OF DETERMINATION

NO UNEMPLOYMENT INSURANCE BENEFITS WILL BE PAID TO YOU FOR THE PERIOD BEGIN-
NING 12/12/2017 UNTIL YOU HAVE SUBSEQUENTLY WORKED FOR AN EMPLOYER AND EARNED
AT LEAST 10 TIMES YOUR WEEKLY BENEFIT RATE. EMPLOYMENT AND EARNINGS FROM NON
COVERED, EXCLUDED OR SELF-EMPLOYMENT WILL NOT COUNT. YOUR WEEKLY BENEFIT RATE
IS $327.

DETERMINATION

YOU WERE DISCHARGED FOR MISCONDUCT IN CONNECTION WITH YOUR EMPLOYMENT WITH
THE ABOVE EMPLOYER. BECAUSE OF THIS DETERMINATION, YOU WILL NOT BE ABLE TO
USE YOUR WAGES FROM THIS EMPLOYER BEFORE 12/12/2017 TO COLLECT UNEMPLOYMENT
INSURANCE BENEFITS IN THE FUTURE.

REASON

YOU WERE DISCHARGED BECAUSE ON 11/29/17 YOU HAD AN ELECTRIC SCOOTER
IMPROPERLY STORED IN THE GAS METER ROOM. THIS WAS IN VIOLATION OF NEW YORK
CITY BUILDING CODE PROHIBITING GAS METER ROOM USE IN ANY WAY FOR STORAGE
PURPOSES. YOU HAD A WARNING ON 9/12/17 FOR PERFORMANCE ISSUES. AS
SUPERINTENDENT, YOU KNEW OR SHOULD HAVE KNOWN YOUR ACTIONS JEOPARDIZED YOUR
JOB. IF YOU DISAGREE WITH THIS DETERMINATION, YOU MUST REQUEST NEW HEARING.

2. [ ] NOTICE OF DETERMINATION OF WILFUL MISREPRESENTATION

REASON

[ ] This notice supersedes the one sent you dated _____ which has been
cancelled.

**TO PROTECT YOUR RIGHTS, READ THE BACK OF THIS FORM**     By: LABOR SERVICES REPRESENTATIVE
                                                              **FOR THE COMMISSIONER OF LABOR**

LO 412 (4-99)

# Unemployment Insurance Benefits Hearing Information

## To Claimant:

**Right to a hearing:** If you disagree with this determination, you have the right to request a hearing before an impartial Administrative Law Judge. This is at no cost to you.

**How to request a hearing:** You must request a hearing no later than thirty (30) days from the mail date on this notice. If you do not, you may lose the opportunity to contest this determination. You can request a hearing online by sending a secure message through your NY.gov account. Go to: www.labor.ny.gov/signin. You may also make your request by filling out the Claimant Request for Hearing (LO 435) form. Go to https://labor.ny.gov/formsdocs/ui/LO435.pdf. Your request must include the last four digits of your Social Security number, your current mailing address and phone number, the mail date of this determination and why you disagree with it.

**Representation at hearings:** You have the right to bring an attorney or other representative of your choice with you to a hearing, though it is not required. For a list of legal resources, go to www.uiappeals.ny.gov. Select the "Resources" tab and then "List of Attorneys and Authorized Agents."

**More hearing information:** For more information about hearings, see the Unemployment Insurance Claimant Handbook at: www.labor.ny.gov/uihandbook and our Frequently Asked Questions at https://labor.ny.gov/ui/claimantinfo/HearingProcess.shtm. You can also call the Telephone Claims Center at (888) 209-8124 from 8:00 AM to 5:00 PM, Monday through Friday.

**Weekly certification:** Benefits may be withheld while you wait for the hearing. If the Administrative Law Judge decides in your favor, any benefits due to you will be paid retroactively as long as you have continued to claim weekly benefits. You should claim for each week that you are still unemployed or working less than four days and earning less than the maximum benefit amount.

**Can I still collect benefits on this claim:** If you agree with this determination, you might still be eligible for future benefits on this claim or you may be able to file a new claim for benefits. For more information, call the Telephone Claims Center at (888) 209-8124.

**Overpayments and Monetary Penalties:** If you have not repaid the entire amount of benefits overpaid to you and any monetary penalties, the Department of Labor may take legal action to file a judgement against you. Any payments due to you from New York State may also be seized. These payments include future Unemployment Insurance benefits, contract payments, state and federal tax refunds and other payments. If you cannot pay the full amount you owe at one time, call (800) 533-6600 to request a payment plan.

**Forfeit penalty:** If you have a forfeit penalty, your future Unemployment Insurance benefits will be reduced by the number of forfeit days indicated. This means you will not receive benefits until after you have claimed benefits for days equal to the number of your forfeit penalty days. Remember, you must certify for benefits in order to reduce the penalty.

## To Employer:

If you are not satisfied with this determination, you may ask for a hearing before an impartial Administrative Law Judge. This is at no cost to you.

Your request must be made in writing to the New York State Department of Labor (DOL) address on the front of this notice. It must be postmarked no later than thirty (30) days from the date of this notice. If your request is postmarked later than thirty (30) days, you should provide the specific reason for the late request.

If you request a hearing, you must provide complete details on why you object to the determination. Failure to state your objections with specifics may result in a limitation on the grounds you may raise at the hearing. A copy of your objections will be sent to the claimant.

For more information about hearings, see the Employer's Guide to Unemployment Insurance, Wage Reporting and Withholding Tax (NYS50), visit, http://labor.ny.gov/ui/employer.shtm, or call (888) 899-8810.

# Exhibit "R"



JAYSON S. MYERS
CHIEF ADMINISTRATIVE LAW JUDGE
TERESA A. DEMEO
CHRISTOPHER M. TATE
MATTHEW J. TIERNEY
PRINCIPAL ADMINISTRATIVE LAW JUDGE

# STATE OF NEW YORK
## UNEMPLOYMENT INSURANCE APPEAL BOARD
### ADMINISTRATIVE LAW JUDGE SECTION
P.O. BOX 29002
BROOKLYN NY 11202-9002
(718) 613-3500
FAX:(718) 613-3566

CAROL PROCOPIO
BENJAMIN H. REYES
DENNIS TORREGGIANI
NICOLE BEASON
RACHEL FREEMAN
JUSTIN DENTON
SENIOR ADMINISTRATIVE LAW JUDGE

## *DECISION AND NOTICE OF DECISION*
## *DECISIÓN Y AVISO DE LA DECISIÓN TOMADA*

A.L.J. Case No. 018-04901

Mailed and Filed: March 21, 2018

IN THE MATTER OF:

REFKI KASTRATI
297 CLINTON ST #1
NEW BRITAIN CT 06053

PROGRESS OF PEOPLES
MANAGEMENT CORP
191 JORALEMON ST
BROOKLYN NY 11201-4306

XHERAHIR KASTRATI
297 CLINTON ST
NEW BRITAIN CT 06053

EQUIFAX WORKFORCE
SOLUTIONS
PO BOX 6001
PEABODY MA 01961-6001

Department of Labor Office: 831

Hearing Requested: February 25, 2018

**PLEASE TAKE NOTICE** that this decision has been duly mailed on the date listed above. If you appeared at the hearing and are not satisfied with this decision, you may appeal within **TWENTY DAYS** from the date this decision was mailed. **READ IMPORTANT INFORMATION ON REVERSE SIDE REGARDING YOUR RIGHT TO APPEAL.** Any party who failed to appear at the hearing has the right to apply to reopen the case. For the application to be granted, the party must apply within a reasonable time and must establish good cause for its failure to appear.

**POR FAVOR TOME NOTA:** esta decisión ha sido debidamente enviada por correo en la fecha que aparece arriba. Si usted asistió a la audiencia y no está satisfecho con la decisión, puede apelar dentro de **VEINTE DÍAS** contados a partir de la fecha en que esta decisión fue enviada por correo. **LEA LA INFORMACIÓN IMPORTANTE AL REVERSO SOBRE SUS DERECHOS DE APELACIÓN.** Cualquiera de las partes que falle en comparecer a la audiencia, tiene el derecho de solicitar que se reabra su caso. Para que dicha solicitud sea otorgada, la parte interesada debe solicitarlo dentro de un periodo de tiempo razonable y debe establecer buena causa por no haber comparecido a la audiencia.

**DOCUMENTO IMPORTANTE. PUEDE OBTENER UNA TRADUCCIÓN DEL MISMO LLAMANDO AL 1-888-209-8124 (FUERA DEL ESTADO DE NUEVA YORK 1-877-358-5306)**

ISSUES:    Loss of employment through misconduct.

The Department of Labor issued the initial determination disqualifying the claimant from receiving benefits effective December 12, 2017, on the basis that the claimant lost employment through misconduct in connection with that employment and holding that the wages paid to the claimant by PROGRESS OF

## CLAIMANTS

**IF YOU DISAGREE WITH THIS DECISION, YOU HAVE A RIGHT TO APPEAL TO THE UNEMPLOYMENT INSURANCE APPEAL BOARD.**

Parties may be represented by lawyers or other persons of their choice on appeal to the Appeal Board. For representing a claimant, a lawyer or an agent registered by the Appeal Board may charge a fee. The fee must be approved by the Appeal Board before payment may be accepted by such lawyer or agent. No other person may charge a fee for representing a claimant. If you do not have enough money to hire a lawyer or registered agent, you may be able to get one free through your local Legal Aid Society or Legal Services Program.

**TO APPEAL A DECISION**

1.    Continue to follow all instructions from the Unemployment Insurance office where you originally filed your claim and to certify for benefits as long as you are unemployed and claiming benefits. This will protect your rights to any benefits you claim.

2.    Within twenty (20) days of the date printed on the face of this decision, mail a letter to the office where you originally filed your claim or to the Appeal Board at P.O. Box 15126, Albany, New York 12212-5126, or fax your appeal to the Appeal Board at (518) 402-6208. Please state that you wish to appeal and the reasons for your appeal. Include your ALJ Case Number (found just above your name on the face of the Notice of Decision) and a copy of the Notice of Decision.

3.    Claimants who appeal are **not** required to pay a deposit on filing an appeal.

**EMPLOYERS**

If you wish to appeal this decision, you may file a notice of appeal within twenty (20) days from the date printed on the face of this decision to the office where the claim was originally filed and which issued the initial determination, or to the Unemployment Insurance Appeal Board at P.O. Box 15126, Albany, New York 12212-5126, or you may fax your notice of appeal to the Appeal Board at (518) 402-6208. Such notice of appeal should include the A.L.J. Case Number (found on the face of this Notice of Decision), the reason(s) for the appeal and a copy of the Notice of Decision.

**ALL PARTIES WILL RECEIVE A NOTICE OF RECEIPT OF APPEAL DIRECTLY FROM THE APPEAL BOARD AFTER ANY APPEAL IS MADE.**

INSTRUCCIONES A LOS RECLAMANTES

## RECLAMANTES

**SI NO EST" DE ACUERDO CON ESTA DECISIPN, USTED TIENE DERECHO DE APELARLA A LA JUNTA DE APELACIONES DEL SEGURO POR DESEMPLEO.**

Las partes si lo desean, pueden estar representadas por abogados u otras personas que ellos seleccionen en la apelación a la Junta de Apelaciones (Appeal Board). Un abogado o un agente que esté registrado por la Junta de Apelaciones, puede cobrale honorarios por representarle. Estos honorarios deben ser aprobados por la Junta de Apelaciones antes que el pago pueda ser aceptado por dicho abogado o agente registrado. Ninguna otra persona podrá cobrar honorarios por representar al reclamante. Si usted no tiene suficiente dinero para contratar a un abogado o un agente registrado, puede conseguir uno gratis a través de la Sociedad de Asistencia Legal (Legal Aid Society) o el Programa de Servicios Legales (Legal Services Program).

**PARA APELAR LA DECISIPN**

1.    Continťe siguiendo **todas** las instrucciones de la oficina del Seguro por Desempleo (Unemployment Insurance) donde usted presentó su reclamo originalmente y para certificar por los beneficios mientras permanezca desempleado y esté reclamando beneficios. Esto protegerá su derecho a recibir cualquier beneficio que reclame.

2.    Antes de cumplirse veinte (20) días de la fecha que aparece al frente de esta decisión, envíe una carta a la oficina donde presentó originalmente su petición o al Appeal Board a P.O. Box 15126, Albany, New York 12212-5126, o envíe por fax su apelación al Appeal Board al (518) 402-6208. Por favor, explique que desea apelar y las razones que tiene para hacerlo. Incluya su nťmero de caso ALJ (lo encontrará ericima de su nombre al frente de este Aviso de Decisión) y envíe una copia de este Aviso de Decisión.

3.    Los reclamantes **no** necesitan depositar dinero para poder apelar su caso.

**TODAS LAS PARTES RECIBIR"N UN AVISO DE RECIBO DE APELACIPN DIRECTAMENTE DE LA JUNTA DE APELACIONES DESPU1S DE QUE SU PETICION SEA RECIBIDA.**

AB 665 (02-06)

PEOPLES prior to December 12, 2017, cannot be used toward the establishment of a claim for benefits. The claimant requested a hearing.

A hearing was held at which testimony was taken. There were appearances by the claimant and on behalf of the employer.

FINDINGS OF FACT: Claimant worked as a superintendent for a residential building for about five years until December 11, 2017. The New York City Department of Buildings prohibited using the building's gas meter room for storage. On or about November 29, 2017, claimant charged his motor bike in the gas meter room. He had in the past charged his tools in the gas meter room without employer objection. An employer coordinator observed the motor bike in the gas meter room and he alerted management. Claimant was discharged on December 11, 2017, for having the bike in the gas meter room.

OPINION: Pursuant to Labor Law § 593 (3), a claimant is disqualified from receiving benefits after having lost employment through misconduct in connection with that employment. Pursuant to Labor Law § 527, the wages paid in such employment cannot be used to establish a future claim for benefits.

The credible evidence establishes that claimant was discharged because he had his motor bike charging in the employer's gas meter room. On the record before me, I find that such act constitutes an isolated instance of poor judgment and it did not rise to the level of misconduct. It is noted that there is no evidence that claimant was specifically warned for a prior similar occurrence, he charged his tools there without objection and there is no evidence that he was using the gas meter room for storage of the motor bike. Accordingly, I conclude that claimant is not subject to the disqualification imposed.

DECISION: The initial determination, disqualifying the claimant from receiving benefits effective December 12, 2017, on the basis that the claimant lost employment through misconduct in connection with that employment and holding that the wages paid to the claimant by PROGRESS OF PEOPLES prior to December 12, 2017, cannot be used toward the establishment of a claim for benefits, is overruled.

The claimant is allowed benefits with respect to the issues decided herein.

/s/ Diane Dubiac

**Administrative Law Judge**

## CLAIMANTS

IF YOU DISAGREE WITH THIS DECISION, YOU HAVE A RIGHT TO APPEAL TO THE UNEMPLOYMENT INSURANCE APPEAL BOARD.

Parties may be represented by lawyers or other persons of their choice on appeal to the Appeal Board. For representing a claimant, a lawyer or an agent registered by the Appeal Board may charge a fee. The fee must be approved by the Appeal Board before payment may be accepted by such lawyer or agent. No other person may charge a fee for representing a claimant. If you do not have enough money to hire a lawyer or registered agent, you may be able to get one free through your local Legal Aid Society or Legal Services Program.

**TO APPEAL A DECISION**

1.    Continue to follow **all** instructions from the Unemployment Insurance office where you originally filed your claim and to certify for benefits as long as you are unemployed and claiming benefits. This will protect your rights to any benefits you claim.

2.    Within twenty (20) days of the date printed on the face of this decision, mail a letter to the office where you originally filed your claim or to the Appeal Board at P.O. Box 15126, Albany, New York 12212-5126, or fax your appeal to the Appeal Board at (518) 402-6208. Please state that you wish to appeal and the reasons for your appeal. Include your ALJ Case Number (found just above your name on the face of the Notice of Decision) and a copy of the Notice of Decision.

3.    Claimants who appeal are **not** required to pay a deposit on filing an appeal.

EMPLOYERS

If you wish to appeal this decision, you may file a notice of appeal within twenty (20) days from the date printed on the face of this decision to the office where the claim was originally filed and which issued the initial determination, or to the Unemployment Insurance Appeal Board at P.O. Box 15126, Albany, New York 12212-5126, or you may fax your notice of appeal to the Appeal Board at (518) 402-6208. Such notice of appeal should include the A.L.J. Case Number (found on the face of this Notice of Decision), the reason(s) for the appeal and a copy of the Notice of Decision.

**ALL PARTIES WILL RECEIVE A NOTICE OF RECEIPT OF APPEAL DIRECTLY FROM THE APPEAL BOARD AFTER ANY APPEAL IS MADE.**

INSTRUCCIONES A LOS RECLAMANTES

## RECLAMANTES

SI NO EST" DE ACUERDO CON ESTA DECISIPN, USTED TIENE DERECHO DE APELARLA A LA JUNTA DE APELACIONES DEL SEGURO POR DESEMPLEO.

Las partes si lo desean, pueden estar representadas por abogados u otras personas que ellos seleccionen en la apelación a la Junta de Apelaciones (Appeal Board). Un abogado o un agente que esté registrado por la Junta de Apelaciones, puede cobrale honorarios por representarle. Estos honorarios deben ser aprobados por la Junta de Apelaciones antes que el pago pueda ser aceptado por dicho abogado o agente registrado. Ninguna otra persona podrá cobrar honorarios por representar al reclamante. Si usted no tiene suficiente dinero para contratar a un abogado o un agente registrado, puede conseguir uno gratis a través de la Sociedad de Asistencia Legal (Legal Aid Society) o el Programa de Servicios Legales (Legal Services Program).

**PARA APELAR LA DECISIPN**

1.    Contin‡e siguiendo **todas** las instrucciones de la oficina del Seguro por Desempleo (Unemployment Insurance) donde usted presentó su reclamo originalmente y para certificar por los beneficios mientras permanezca desempleado y esté reclamando beneficios. Esto protegerá su derecho a recibir cualquier beneficio que reclame.

2.    Antes de cumplirse veinte (20) días de la fecha que aparece al frente de esta decisión, envíe una carta a la oficina donde presentó originalmente su petición o al Appeal Board a P.O. Box 15126, Albany, New York 12212-5126, o envíe por fax su apelación al Appeal Board al (518) 402-6208. Por favor, explique que desea apelar y las razones que tiene para hacerlo. Incluya su n‡mero de caso ALJ (lo encontrará justo encima de su nombre al frente de este Aviso de Decisión) y envíe una copia de este Aviso de Decisión.

3.    Los reclamantes **no** necesitan depositar dinero para poder apelar su caso.

**TODAS LAS PARTES RECIBIR"N UN AVISO DE RECIBO DE APELACIPN DIRECTAMENTE DE LA JUNTA DE APELACIONES DESPU1S DE QUE SU PETICION SEA RECIBIDA.**

# Exhibit "S"

Please be advised that the grass cutter was left in the gas meter room prior to Mr. Kastrati's termination, evidence by the attached photo taken December 4th 2018. He was advise on many occasions to clean out said room. John, porter for the site removed the snow blower from an outside storage room between 1/8 & 1/19 18 as there was a prediction of snow in the forecast around that time. The snow blower was returned to the correct closet after the weather advisory. Please note that this was a common practice by John and Mr. Kastrati.

Attached, please find an email from Mary Whelan who conducted a site visit at Mary Star on 3/8/17, following our conversation about items being stored in the gas meter room. Mary's email also advised Mr. Kastrati to clean out said room. I received a great deal of resistance from Mr. Kastrati so Mary and Tim from the facilities department was very supportive in trying to assist me with to enforcing that Mr. Kastrati clean out that room.

Mr. Kastrati was allowed to remain in the super's unit after his termination because he advised me that he needed more time to vacate the premise. I advised my Supervisor of this and an agreement was reached between him and Mr. Kastrati. Mr. Kastrati was advised that he had until 1/20/18, to vacate the apartment.

Mr. Kastrati moved out on 1/20/18, evidence by the attached photos. Porter John Belfon was at the building when Mr. Kastrati moved out. He received a number of keys from Mr. Kastrati shown in the attached photo. In those keys we discovered an additional set of keys that unlocked the gas meter, boiler and several other rooms in the basement. Mr. Kastrati advised me during his termination that he only had 2 key fobs and 2 sets of keys for his apartment door. John also reported that Mr. Kastrati took with him a grinder that was purchased by the building. Also note that Mr. Kastrati also left a number of items in the gas meter room as he used this area for storage.

Please let me know if you have any questions or need any additional information.

Thank you,



**Gloria Mitchell**
**Regional Property Manager, Progress of Peoples Management Corp.**
*Affiliate of Catholic Charities, Brooklyn & Queens*
191 Joralemon Street | Brooklyn, NY 11201
C:347.524.5260 E-Mail: gloria.mitchell@ccbq.org | www.ccbq.org

# Exhibit "T"

From: MARY WHELAN
Sent: Thursday, March 16, 2017 11:44 AM
To: Refki Kastrati
Subject: 41 1st Street_Site Visit

Good morning Refki. As discussed during my visit last we I asked that you do the following:

1. Clear all items in basement by Exit Door (plants; tables, etc); this is in violation with FDNY

2. Clean up + clear up storage areas; organize space;

3. Paint room – store all paint supplies accordingly; have Gloria call up Maxie to remove items

4. Lights in basement always on – please shut off lights to rooms that are not used

5. Basement door to be remained locked

6. Gate to remained locked in parking lot.

If not already done, please have this request completed by end of business Friday, March 24th.

Any questions or concerns please feel free to let me or Tim know.

Thank you.

Mary Whelan
Facilities Coordinator, Progress of Peoples Management Corporation
*Affiliate of Catholic Charities Diocese of Brooklyn and Queens*
Ph: 718-215-5430 | E-Mail: Mary.Whelan@ccbq.org | www.ccbq.org



# Exhibit "U"

Bledi Kastrati
New Britain, CT 06053
E-mail: Bledi_Kastrati@yahoo.com

I, Bledi Kastrati born May 13, 1995, give permission to my father Refki Kastrati the right to use my mental condition for his complain in the Federal Court.

If you have any question or concerns, please do not hesitate to contact me by E-mail: Bledi_Kastrati@yahoo.com.

Thank you,

# Exhibit "V"

Xhevahir Daftallari Kastrati
New Britain, CT 06053
Ph# 646-244-4719
E-mail: mamuqe@hotmail.com

I, Xhevahir Daftallari Kastrati give a permission to my husband Refki Kastrati to use my medical history of my hospitalization and referred doctor with diagnoses and prescription given.

If you have any question or concerns, please do not hesitate to call me at 646-244-4719, or by e-mail at: mamuqe@hotmail.com.

Thank you,

 Wheeler

**Patient ID:** 000030006197
**Location Name:** OP A NBrit 75 NMR
**Today's Provider:** Maurice Bunnell

**Patient Name:** Xhevahir Daftallari- Kastrati
**Assessment Date:** 11/01/2018 12:30 PM
**Visit Type:** Office Visit

Patient Copy
Thank you for making us you Primary Care Provider of choice. The following is a summary of the outcome of today's visit and other instructions and information we hope you find helpful.

*Dx: Major Depressive Disorder . MEB*

*First appt with this provdr 8/2/18 - MEB*

**Next Scheduled Appointment**
11/21/2018 9:00AM

## Medications

| Medication | Dose | Sig Description | PRN Status | PRN Reason | Comments |
|---|---|---|---|---|---|
| alprazolam 0.5 mg tablet | 0.5 mg | take 1 tablet by oral route 2 times every day | N | | taking as directed |
| alprazolam 0.5 mg tablet | 0.5 mg | take 1 tablet by oral route every day | N | | taking as directed |
| alprazolam 0.5 mg tablet | 0.5 mg | take 1 tablet by oral route 2 times every day | N | | taking as directed |
| duloxetine 30 mg capsule,delayed release | 30 mg | take 1 capsule by oral route every day | N | | taking as directed |
| duloxetine 40 mg capsule,delayed release | 40 mg | take 1 capsule by oral route every day | N | | |
| Narcan 4 mg/actuation nasal spray | 4 mg/actuation | spray 0.1 milliliter by intranasal route in 1 nostril may repeat dose every 2-3 minutes as needed alternating nostrils with each dose | N | | |
| Remeron 15 mg tablet | 15 mg | take 1 tablet at bedtime | N | | taking as directed |
| Remeron 15 mg tablet | 15 mg | take 1 tablet at bedtime | N | | taking as directed |

Sincerely,

*Provider:*
Bunnell, Maurice E 11/01/2018 12:48 PM